**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MANUEL TARANGO, JR.,
*Petitioner-Appellant*,

v.

E. K. MCDANIEL; NEVADA
ATTORNEY GENERAL,
*Respondents-Appellees*.

No. 13-17071

D.C. No.
3:10-cv-00146-RCJ-VPC

ORDER AND
AMENDED OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted December 12, 2014
San Francisco, California

Filed March 3, 2016
Amended September 16, 2016

Before: Raymond C. Fisher, Johnnie B. Rawlinson, and
Mary H. Murguia, Circuit Judges.

Order;
Opinion by Judge Murguia;
Dissent by Judge Rawlinson

# SUMMARY[*]

## Habeas Corpus

The panel filed (1) an order amending its opinion and accompanying dissent and denying a petition for panel rehearing and a petition for rehearing en banc and (2) an amended opinion and dissent in a habeas corpus case.

In the amended opinion, the panel vacated the district court's denial of a habeas corpus petition, in which a Nevada state prisoner claimed violation of his due process right to a fair and impartial jury, where a police vehicle followed a known hold-out juror, for approximately seven miles, on the second day of deliberations in a highly publicized trial involving multiple police victims.

The panel held that the Nevada Supreme Court's decision upholding the petitioner's convictions was contrary to *Mattox v. United States*, 146 U.S. 140 (1892), because the court improperly limited its inquiry to whether the external contact amounted to a "communication" and did not investigate the prejudicial effect of the police tail. The panel therefore reviewed *de novo* the question whether the extrinsic contact could have influenced the jury's verdict and prejudiced the petitioner. Because the state trial court prevented the petitioner from offering certain evidence to demonstrate prejudice, the panel remanded for an evidentiary hearing and further fact finding.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge Rawlinson wrote that *Mattox* is far afield from the dispositive issue, the majority gives no deference to the decision of the Nevada Supreme Court but engages in impermissible appellate fact finding, and no Supreme Court case supports the majority's conclusion.

## COUNSEL

Ryan Norwood (argued), Assistant Federal Public Defender; Rene Valladares, Federal Public Defender; Office of the Federal Public Defender, Las Vegas, Nevada; for Petitioner-Appellant.

Victor-Hugo Schulze, II (argued), Senior Deputy Attorney General; Lawrence VanDyke, Solicitor General; Adam Paul Laxalt, Attorney General; Office of the Attorney General, Las Vegas, Nevada; for Respondents-Appellees.

## ORDER

The opinion and accompanying dissent filed March 3, 2016 are hereby amended.

Judge Fisher and Judge Murguia vote to deny the petition for panel rehearing and petition for rehearing en banc. Judge Rawlinson votes to grant the petition for panel rehearing and petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are **DENIED** (Doc. 36).

No further petitions for rehearing and/or rehearing en banc will be entertained.

---

**OPINION**

MURGUIA, Circuit Judge:

Petitioner Manuel Tarango, Jr. appeals the district court's denial of his petition for a writ of habeas corpus. He claims violation of his due process right to a fair and impartial jury, where a police vehicle followed Juror No. 2, a known hold-out against a guilty verdict, for approximately seven miles, on the second day of deliberations, in a highly publicized trial involving multiple police victims. Tarango argues that the Nevada Supreme Court's decision upholding his convictions "was contrary to, or involved an unreasonable application of, clearly established federal law," *see* 28 U.S.C. § 2254(d)(1), because the court failed to consider whether the contact between the juror and the police vehicle prejudiced the jury's verdict.

We hold that the Nevada Supreme Court's decision was contrary to *Mattox v. United States*, 146 U.S. 140 (1892), because the court improperly limited its inquiry to whether the external contact amounted to a "communication" and did not investigate the prejudicial effect of the police tail. We therefore review *de novo* the question whether the extrinsic contact could have influenced the verdict and prejudiced Tarango. Because the trial court prevented Tarango from

offering certain evidence to demonstrate prejudice, we remand for an evidentiary hearing and further fact finding.

## BACKGROUND

On December 5, 1999, a rock band of off-duty Las Vegas police officers, Metro Mike's Pigs in a Blanket, was performing at a local bar called Mr. D's. The bar was filled with off-duty police officers. A group of masked men entered the bar announcing a robbery, and a shoot-out ensued. Several patrons were shot, one robber was shot and killed, and one police officer, Officer Dennis Devitte, was shot several times. The surviving robbers escaped the scene and, six years later, Tarango was brought to trial on seven felony counts. The 2005 trial received considerable local media attention, and numerous Las Vegas Metro police officers attended as both witnesses and spectators.

After the jury began its deliberations, on November 1, 2005, the foreperson sent a note to the trial judge indicating that the jury had "reached a stalemate" because of a "problem juror" who had "made it very clear he does not want to be part of [the] process [and] is refusing to discuss or interact with the other jurors." The "problem juror" separately wrote to the judge indicating that he had "doubt of which [he] feel[s] is beyond the limit of reasonable doubt," and that deliberations were "not curing [his] doubt." In his note, the "problem" juror identified himself as Juror No. 2.

Over Tarango's objection,[1] the judge advised the jury to continue deliberating.  The next day, November 2nd, the jury returned a verdict finding Tarango guilty of all seven felony counts as charged: burglary with the use of a deadly weapon, attempted robbery with the use of a deadly weapon, conspiracy to commit robbery with the use of a deadly weapon, three counts of battery with the use of a deadly weapon, and attempted murder with the use of a deadly weapon—all in violation of Nevada state law.

On November 3rd, the *Las Vegas Review-Journal* reported the guilty verdict in an article titled *Man Convicted in 1999 Case*.  The article referenced "a juror who spoke to the *Review-Journal*."  Discussing the jury's deliberation process, the interviewed juror mentioned the hold-out juror: "the case was close to a hung jury because one juror seemed unwilling to convict following nearly two days of deliberations."

On November 4th, prompted by the previous day's newspaper article, Juror No. 2 wrote a letter to the court referencing the article:

> I am the one Juror mentioned in the article. . . .  I am also the Juror that wrote you the note during deliberations.  It read: "I have doubt beyond the limit of what I consider reasonable doubt."  I also stated, "I did not believe further deliberations would cure that doubt."

---

[1] Tarango argued that Juror No. 2's note indicated that the jury was hung, and moved for a mistrial, there being no alternate jurors left to take Juror No. 2's place.

Further deliberations in fact, did not cure my doubt.

However, when returning to re-deliberate Wednesday November 2nd from the Henderson area, a Metro squad car followed me northbound on I-95 and into the downtown area.

I found that action unnerving.

I realize the State has much time and money invested in this case. There were [*sic*] no alternate Juror. I concluded Metro somehow knew who I was and knew of my unwillingness to convict. I have never been in trouble with the law. Therefore, I relinquished my vote under duress. I only ask, within the law, please show [Tarango] leniency.

One week later, on November 11th, Juror No. 2 emailed Tarango's trial attorney, Marc Saggese, and attached a copy of his "Letter to the Judge." The juror told Saggese that he felt "compelled to notify" Saggese of the letter. Saggese promptly filed a motion to dismiss all charges with prejudice or, alternatively, to grant a new trial on the ground of juror misconduct, arguing that Juror No. 2's communication indicated that the deliberation process had been tampered with in violation of Tarango's right to due process. Under Nevada law, juror misconduct refers to two categories of conduct: (1) intrinsic misconduct, that is, "conduct by jurors contrary to their instructions or oaths;" and (2) extrinsic misconduct, or "attempts by third parties to influence the jury

process."[2]  *Meyer v. State*, 80 P.3d 447, 453 (Nev. 2003). Tarango alleged both forms of misconduct, arguing that (1) Juror No. 2 changed his vote under pressure, rather than based on admissible evidence of Tarango's guilt, because of (2) an improper third party influence.

In support of the motion, Saggese submitted a declaration indicating that, after the trial court read the juror notes into the record and while deliberations were ongoing, Saggese overheard Deputy District Attorney Marc DiGiacomo report to Detective James Vacarro over the phone that one juror, Juror No. 2, was holding out.  Saggese thus indirectly corroborated Juror No. 2's stated belief that he was being targeted as a hold-out juror by introducing evidence that members of the Las Vegas police department both knew that

---

[2] *Meyer* further clarifies the distinction:

> The first category includes jurors failing to follow standard admonitions not to discuss the case prior to deliberations, accessing media reports about the case, conducting independent research or investigation, discussing the case with nonjurors, basing their decision on evidence not admitted, discussing sentencing or the defendant's failure to testify, making a decision on the basis of bias or prejudice, and lying during voir dire.  It also includes juror incompetence issues such as intoxication.  The second category involves attempts to influence the jury's decision through improper contact with jurors, threats, or bribery.

80 P.3d at 453. (internal citations omitted).

Juror No. 2 favored acquittal and had knowledge of Juror No. 2's identity.[3]

The trial court held a full hearing on Tarango's motion the following month. Juror No. 2, Defense Attorney Saggese, Detective Vacarro, and Deputy D.A. DiGiacomo were all called to testify regarding their knowledge of the alleged events and communications in question. At the hearing, the court limited the questioning of Juror No. 2 pursuant to a provision of the Nevada Code of Evidence, Nev. Rev. Stat. § 50.065, which prohibits the admission for any purpose of testimony, affidavits, or evidence of any statement by a juror indicating an effect on the jury's deliberative process. The court also relied on the Nevada Supreme Court case of *Meyer v. State*, which provides that "[u]pon an inquiry into the validity of a verdict . . . , a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations, or to the effect of anything upon that or any other juror's mind."[4] 80 P.3d at 454 (quoting Fed. R. Evid.

---

[3] During voir dire, the parties and the trial court learned various details about Juror No. 2's life. Juror No. 2 had served in the Air Force for four years doing "flight instrument trainers [*sic*], [and] navigation." He completed both high school and also trade school in electronics. At the time of his jury service, Juror No. 2 was employed as a network administrator, was married, and had a daughter. He had lived in Clark County, Nevada since 1991.

[4] *Meyer* also observes, though, that where juror misconduct involves "extrinsic information or contact with the jury, juror affidavits or testimony establishing the fact that the jury received the information or was contacted are permitted." *Meyer*, 80 P.3d at 454. *Meyer* distinguished extrinsic information about which a juror may testify from intrinsic influences that are "generally not admissible to impeach a verdict" as follows: "An extraneous influence includes, among other things . . . third-party communications with sitting jurors. In contrast, intra-jury or

606(b)).  The trial court ultimately conducted all questioning of Juror No. 2 itself.  Juror No. 2 testified as follows:

> [Right after getting on the freeway,] I was in the center lane [of US-95].  I noticed a Metro squad car behind me; fairly close behind me. . . .  He was close enough I couldn't see his front wheels or bumper.  And I looked down and I was not exceeding the speed limit.
>
> . . .
>
> I signaled and got over to the far right lane anticipating being pulled over and he stayed tight behind me.
>
> . . .
>
> I maintained under the speed limit anticipating being pulled over.  A couple minutes and he never lit up, he never indicated that he was . . . going to pull me over.  So I just maintained right lane position under the speed limit.  This continued on.
>
> . . .
>
> [At Eastern Avenue] there was a lot of traffic entering the freeway . . . .  [T]here was so many cars trying to merge into the freeway

---

intrinsic influences involve improper discussions among jurors . . . , intimidation or harassment of one juror by another, or other similar situations . . . ."  *Id.* (footnotes omitted).

that the Metropolitan squad car actually pulled up closer to prevent anyone from pulling in between our vehicles.

. . .

And as soon as the . . . exit to Las Vegas Boulevard came, I even slowed down under 50, and that's a long exit there. It's, um, a quarter mile, half a mile, and even at that, he maintained position.

And he's not pulling me over. He's not . . . giving me a citation for nothing. He followed me down the hill, and at the stoplight for Las Vegas Boulevard. . . . He followed me, still tight. And there's several stop lights, something, Stewart, and then Carson is where the juror parking garage is. And we did get a red light there. He was still behind me. I took a right to enter the . . . jurors parking lot. That's when he relieved me from the escort or whatever he was doing. That's when he left me alone.

When questioned, Juror No. 2 indicated that he could not tell whether the driver of the vehicle was male or female, and he could not report the squad car number. However, Juror No. 2 averred that the car behind him was "a Metropolitan black and white vehicle." When questioned a second time, Juror No. 2 reiterated that the car remained "consistently" tight behind him for the duration of his commute to the courthouse—"[c]lose enough that [he] couldn't see the officer's bumper."

At the end of the hearing, the court orally denied Tarango's motion to dismiss or to grant a new trial. The trial court did not discredit Juror No. 2's testimony, and made one factual finding that Juror No. 2 "was followed closely, tightly, however you want to state it from Tropicana on US-95 to Las Vegas Boulevard and Carson."[5] The court went on to reach the following legal conclusion:

> I don't think there's any evidence of juror misconduct. There were no attempts to influence the jury. There's no outside influence on this particular juror. There's no communication or contact. The alleged conduct is ambiguous, it's vague and nonspecific in content. I'm required to consider this extrinsic influence in light of the trial as a whole, and consider the weight of the evidence against Mr. Tarango and with that, and based on the [*Meyer*] decision, and the reasonable person test that I'm required to apply. I don't think that Mr. Tarango has met his burden. Therefore, the motion is denied.[6]

---

[5] Having taken judicial notice of a roadmap of Las Vegas, Nevada, we confirm that the distance from East Tropicana Avenue on US-95 to South Las Vegas Boulevard and East Carson Avenue is approximately 7.5 miles.

[6] Juror No. 2 wrote a second letter to the trial judge following the hearing. The letter begins, "Your Honor; Please accept this letter as an apology. I was given the privilege to serve as a Juror and I failed." Juror No. 2 went on to apologize to God, his fellow Jurors, the Las Vegas Metropolitan Police Department, and the "Citizens of this Great State Nevada." He explained that his verdict was "untrue to [his] conscience," because he "let fear of reprisal enter into [his] mind and heart." As a result, Juror No. 2 expressed his desire "to nullify [his] verdict." Juror No. 2 conceded that his request "may not be taken legally," because he was

Weeks later, at a televised proceeding on February 8, 2006, the trial court denied Tarango's motion to reconsider on the basis of jury misconduct and entered judgment against him. The trial court sentenced Tarango to a 22–58 year term of imprisonment. Tarango promptly appealed the denial.

In September 2007, the Nevada Supreme Court affirmed the state trial court's denial of Tarango's motion for a new trial. *Tarango v. State*, No. 46680 (Nev. Sept. 25, 2007). The Nevada Supreme Court stated the relevant test as follows: "For a defendant to prevail on a motion for a new trial based on misconduct, the defendant must present admissible evidence sufficient to establish (1) the occurrence of misconduct, and (2) a showing that the misconduct was prejudicial."[7] *Id.*, slip op. at 2 (citing *Meyer*, 80 P.3d at 455).

The Nevada Supreme Court first concluded that Juror No. 2's letters to the trial court were properly deemed inadmissible to prove that Juror No. 2 had voted guilty in violation of the jury instructions or contrary to his oath as a juror, reasoning that "for misconduct to be proved it 'must be based on objective facts and not the state of mind or deliberative process of the jury.'" *Id.*, slip op. at 6 (quoting *Meyer*, 80 P.3d at 454). Absent Juror No. 2's letters, the Nevada Supreme Court concluded that the "testimony of

---

ignorant of legal procedures, but that he "personally nullif[ies] [his] verdict to all those that will forgive me."

[7] The Nevada Supreme Court did not cite any United States Supreme Court authority in rendering its decision, but this is immaterial provided the state law is not inconsistent with clearly established federal law. *See Early v. Packer*, 537 U.S. 3, 8 (2002). Rather, as did the trial court, the Nevada Supreme Court relied almost entirely on its 2003 decision in *Meyer*.

[Defense Attorney Saggese, Detective Vacarro, and Deputy D.A. DiGiacomo] was insufficient to show by objective facts that [Juror No. 2] committed misconduct." *Id.* The Nevada Supreme Court held that Tarango had thus failed to show by admissible evidence that Juror No. 2 had committed misconduct. *Id.*

The Nevada Supreme Court further held that there was no evidence of an improper external influence on Juror No. 2. Although the Nevada Supreme Court assumed "arguendo that [Juror No. 2] was followed by a marked police car," and observed that "any unauthorized communication between law enforcement and a juror about a matter pending before a jury may be 'presumptively prejudicial,'" the court concluded that "[Juror No. 2] failed to show by objective facts that there was an improper external communication between him and the police." *Id.*, slip op. at 6–7. The Nevada Supreme Court explained that "it is not clear whether being followed by a marked car qualifies as a communication at all. It is even more dubious as to whether such a 'communication' was about a matter pending before the jury." *Id.*, slip op. at 7. In other words, having found that no "communication" had occurred, the Nevada Supreme Court determined that the alleged influence of the non-communicative contact was "too speculative" to sustain Tarango's motion for a new trial and did not reach the second prong of the misconduct inquiry—whether the contact was prejudicial. *Id.*

Following state habeas proceedings, Tarango timely filed his federal habeas petition on March 15, 2010. The federal district court for the District of Nevada was "tempted to say that the fact Juror 2 rendered his verdict based not upon the law and evidence, but because of his perception of a threat, is dispositive." However, without citing authority, the district

court concluded that "Supreme Court case law is clear that objective proof of external contact is required." It further concluded that the state court did not err in concluding that no external contact had occurred, although the court found that determination "debatable." The district court therefore dismissed Tarango's petition in September 2013, upholding as reasonable the state court's determination that Tarango had failed to show any improper external contact.

On October 16, 2013, the district court granted Tarango a Certificate of Appealability as to Ground One of his amended petition, and Tarango filed a Notice of Appeal the same day. Ground One reads as follows:

> Tarango was convicted because one of the jurors believed that the State was trying to intimidate him, and not because he believed Tarango was guilty. As such, Tarango is incarcerated in violation of his right to a Fair Trial, an Impartial Jury, and Due Process under the 6th and 14th Amendments of the United States Constitution.

Tarango raises only the certified issue in his appeal before us.

## DISCUSSION

### I.

We review de novo a district court's denial of a habeas corpus petition. *Hurles v. Ryan*, 752 F.3d 768, 777 (9th Cir. 2014). But where, as here, a state court has adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) compels us to accord

significant deference to the underlying state court decision. *See* 28 U.S.C. § 2254(d)(1)–(2)*.*  This court may grant relief only when the state court's adjudication of that claim either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented at the State Court proceeding."  *Id.*

Where a state court fails to apply the clearly established federal law, applying an incorrect standard in reaching its decision, "the state court's adjudication [is] contrary to clearly established law."  *Lafler v. Cooper*, 132 S. Ct. 1376, 1390 (2012) (holding that state court adjudication was contrary to clearly established federal law because it failed to apply *Strickland* to an ineffective-assistance-of-counsel claim).  And in that circumstance, federal habeas courts "can determine the principles necessary to grant relief."  *Id.* (citing *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007)).  In other words, a state court's failure to apply the proper standard under clearly established federal law "allows federal-court review . . . without deference to the state court's decision" and "unencumbered by the deference AEDPA normally requires."  *Panetti*, 551 U.S. at 948; *see also Castellanos v. Small*, 766 F.3d 1137, 1146 (9th Cir. 2014) ("If the state court applies a legal standard that contradicts clearly established federal law, we review de novo the applicant's claims, applying the correct legal standard to determine whether the applicant is entitled to relief." (citing *Cooperwood v. Cambra*, 245 F.3d 1042, 1047 (9th Cir. 2001))).

In conducting this review, we look to the "last reasoned decision" by a state court addressing the issue at hand.  *Miles*

*v. Ryan*, 713 F.3d 477, 486 (9th Cir. 2012) (citing *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004))*.* In this case, we look to the Nevada Supreme Court's September 2007 decision affirming the state trial court's judgment on direct appeal.

## II.

The Nevada Supreme Court, after assuming that Juror No. 2 was followed by a police car, decided that such contact did not implicate Tarango's right to due process because it did not amount to a "communication," much less a communication "about a matter pending before the jury." The court declined to consider whether the police tail could have prejudiced the verdict. We hold that the Nevada Supreme Court violated clearly established Supreme Court case law, first by limiting its inquiry to whether the contact amounted to a "communication . . . about a matter pending before the jury" and, second, by failing to examine the potential impact of the non-communicative contact on Juror No. 2's verdict.

## A.

In criminal trials, well-entrenched Supreme Court authority "absolutely" forbids "external causes tending to disturb the [jury's] exercise of deliberate and unbiased judgment . . . at least until their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 149–50 (1892). We have held that *Mattox* established a bright-line rule: any external contact with a juror is subject to a presumption that the contact prejudiced the jury's verdict, but the government may overcome that presumption by showing that the contact was harmless. *Caliendo v. Warden of Cal.*

*Men's Colony*, 365 F.3d 691, 696 (9th Cir. 2004) (citing *United States v. Armstrong*, 654 F.2d 1328, 1331–33 (9th Cir. 1981)).

Clearly established federal law provides that any unauthorized "private communication, contact, or tampering directly or indirectly, with a juror during a trial *about the matter pending before the jury* is, for obvious reasons, deemed presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954) (emphasis added). However, clearly established federal law also compels a criminal trial court to consider the prejudicial effect of *any* external contact that has a "tendency" to influence the verdict, irrespective of whether it is about the matter pending before the jury. *Mattox*, 146 U.S. at 150–51. Moreover, an external contact need not amount to a "communication" to trigger some judicial inquiry into possible prejudice. *See Smith v. Phillips*, 455 U.S. 209, 212–15 (1982) (requiring judicial inquiry into possible prejudice arising from a juror's job application in the office of the prosecutor trying the case); *Mattox*, 146 U.S. at 150 (recognizing the prejudicial potential of "the reading of newspapers").

## B.

The Supreme Court has not established a bright-line test for determining what constitutes a possibly prejudicial "external" influence on a jury. The Court has devoted more recent attention to clarifying what "falls on the 'internal' side of the line." *Warger v. Shauers*, 135 S. Ct. 521, 529 (2014) (holding that a juror's dishonesty during voir dire is internal to the deliberative process and not admissible to impeach a verdict); *see also Tanner v. United States*, 483 U.S. 107, 118–25 (1987) (holding that jurors' consumption of drugs and

alcohol during trial is internal to the deliberative process and not admissible to impeach a verdict). It is clearly established that a juror's physical or mental incapacity, substance abuse, and dishonesty during voir dire all amount to internal—not external—influences on a jury's verdict. *Tanner*, 483 U.S. at 118–25; *Warger*, 135 S. Ct. at 529. On the other end of the spectrum, the Court long ago explained that an "extraneous influence" would include "something which did not essentially inhere in the verdict,—an overt act, open to the knowledge of all the jury, and not alone within the personal consciousness of one." *Mattox*, 146 U.S. at 149 (quoting *Perry v. Bailey*, 12 Kan. 539, 545 (1874)).

In more recent decisions interpreting the *Mattox* rule, the Court has clarified that an external contact need not be intentional, *Gold v. United States*, 352 U.S. 985 (1957) (granting a new trial where the FBI approached jurors about a different but related case, even though "the intrusion was unintentional"), nor verbal, *Smith*, 455 U.S. at 212–15, 221; *see also Mattox*, 146 U.S. at 150 (noting that the presence of an officer in the jury room during the deliberations would be "fatal to the verdict"). Rather, an impermissible external influence can arise where, for example, a juror is shown to have a relationship with the office of the prosecutor trying the case. *Smith*, 455 U.S. at 212. In addition, an external contact need only have influenced one juror, because a defendant is "entitled to be tried by 12 . . . impartial and unprejudiced jurors." *Parker v. Gladden*, 385 U.S. 363, 366 (1966).

The Supreme Court has identified an "extraneous influence" requiring judicial inquiry into prejudice in cases where the jury heard and read information about the defendant's propensity for murder, which was not admitted into evidence, *Mattox*, 146 U.S. at 150–51; where members

of a jury overheard the bailiff make disparaging comments about the defendant, *Parker*, 385 U.S. at 363–65; where a juror was contacted by an FBI agent after being offered a bribe to acquit the defendant, *Remmer*, 347 U.S. at 228–30; and where a juror had submitted an application for employment at the office of the prosecutor trying the case, *Smith*, 455 U.S. at 212, 216–17.

## C.

*Mattox* requires a trial court to examine possible prejudice when it is confronted with evidence of an external contact that has a "tendency" to be "injurious to the defendant." *Mattox*, 146 U.S. at 150. Thus, an external contact with a juror need only raise a credible risk of influencing the verdict to be deemed possibly prejudicial. *Mattox* and its progeny further establish that undue contact with a juror by a government officer almost categorically risks influencing the verdict. Indeed, *Mattox* observed that the mere presence of a court officer or bailiff during the jury's deliberations would "absolutely vitiate the verdict . . . *without regard to whether any improper influences were actually exerted over the jury or not*." *Mattox*, 146 U.S. at 150 (emphasis added); *see also Smith*, 455 U.S. at 221 (holding that a juror's pending job application with the prosecutor's office required a post-trial hearing on juror bias); *Parker*, 385 U.S. at 365 ("[T]he official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury . . . ."); *Remmer*, 347 U.S. at 229 ("The sending of an FBI agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly.").

To be sure, "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith*, 455 U.S. at 217. "[D]ue process does not require a new trial every time a juror has been placed in a compromising situation." *Id.* Threadbare or speculative allegations, or allegations involving "prosaic kinds of jury misconduct" do not trigger a presumption of prejudice. *United States v. Dutkel*, 192 F.3d 893, 894–85 (9th Cir. 1999); *see also Xiong v. Felker*, 681 F.3d 1067, 1077 (9th Cir. 2012) (noting that the Supreme Court jurisprudence regarding juror misconduct "all involved . . . significant, and in some cases deliberate interference with the deliberation process").

Mindful of this reality, and given the need to preserve the finality of a jury's verdict, courts universally prohibit jurors from impeaching their own verdicts through evidence of their internal deliberative process. *See, e.g.*, *Tanner*, 483 U.S. at 117–20. However, regardless of the forms of evidence admissible to demonstrate that a contact occurred, *see United States v. Rutherford*, 371 F.3d 634, 644–45 (9th Cir. 2004), the Supreme Court has unequivocally and repeatedly held that due process requires a trial judge to endeavor to "determine the effect" of occurrences tending to prejudice the jury when they happen.[8] *Smith*, 455 U.S. at 217; *see also Parker*, 385 U.S. at 365; *Remmer*, 347 U.S. at 229–30; *Mattox*, 146 U.S. at 150–51.

---

[8] In *Smith*, for example, the Court held that the district court properly conducted a hearing that explored the "effect" of a juror's relationship with the prosecutor's office before concluding that the defendant was not prejudiced by that relationship. 455 U.S. at 217–18.

## D.

Once a defendant shows an external occurrence having a tendency toward prejudice, federal law clearly requires a trial court to investigate the harmlessness or actual prejudice of the occurrence. *Mattox*, 146 U.S. at 150; *Smith*, 455 U.S. at 215 ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). The *Mattox* Court categorically mandated that "possibly prejudicial" external contacts "invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox*, 146 U.S. at 150. This is required even if, as noted above, the contact did not constitute a communication nor concern a matter pending before the jury. *See Smith*, 455 U.S. at 215; *Mattox*, 146 U.S. at 150. Supreme Court case law also requires this procedure irrespective of whether or not the court knows "what actually transpired" and when, as the dissent highlights, the influence of that contact is speculative or uncertain.[9] *Remmer*, 347 U.S.

---

[9] The dissent incorrectly characterizes our holding as requiring an inquiry into prejudice even where the alleged contact or communication is unsubstantiated. Dissent at 41. To be clear, we agree that if the trial court had discredited Juror No. 2's testimony and found that no pursuit occurred, then neither the trial court nor the Nevada Supreme Court would have had any cause to examine prejudice. *See Caliendo*, 365 F.3d at 698 n.4. But this is not the record before us. The trial court did not discredit the juror's testimony. The trial court characterized the "content" of the police tail as "ambiguous," "vague," and "nonspecific," but the court did not find that no police tail had occurred. Absent any clear finding with respect to the alleged police tail, the Nevada Supreme Court prudently assumed that the juror had been followed. Based on that assumption, in order to determine whether jury tampering occurred, Supreme Court case law requires the court to consider the prejudice or influence of that contact. Contrary to clearly established Supreme Court case law, the Nevada Supreme Court failed to conduct this inquiry.

at 229; *see also id.* at 229–30 (mandating an evidentiary hearing where "*information* . . . [about an external contact] *was received*" by a trial court (emphasis added)). The Supreme Court has further held that prejudice is more probable where the record reflects that a jury could not agree as to the defendant's guilt. *Parker*, 385 U.S. at 365 (citing as evidence of prejudice the fact that "the jurors deliberated for 26 hours, indicating a difference among them as to the guilt of petitioner").

## III.

In sum, the governing Supreme Court case law can be distilled as follows: Where a court receives information, *Remmer*, 347 U.S. at 229–30, about an unauthorized external contact between a juror and a government agent whose official position "carries great weight with a jury,"*Parker*, 385 U.S. at 365, that contact has a "tendency to . . . influence" the verdict, and the trial court must presume the external contact prejudiced the defendant unless the government provides contrary evidence. *Mattox*, 146 U.S. at 150. This is true whether or not the contact was intentional, *Gold*, 352 U.S. at 985, whether or not the contact involved a verbal communication, *Smith*, 455 U.S. at 212; *Mattox*, 146 U.S. at 150, and whether or not the trial court or defendant "know[s] . . . what actually transpired," *Remmer*, 347 U.S. at 229.[10] Once a potentially prejudicial contact is

---

[10] The dissent suggests that *Mattox* "expressly" requires "proof that jury tampering actually occurred," Dissent at 41–42, but this argument misses the point. The Nevada Supreme Court presumed an unauthorized external contact with a juror had occurred. As *Mattox* and its progeny explain, a court must examine the prejudice of such a contact as part of its determination as to whether the contact amounted to jury tampering.

alleged, the court should "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 230.

In this case, the Nevada Supreme Court assumed a contact—albeit not a "communication"—occurred. Our case law compels our conclusion that the contact in question had enough of a tendency to influence the jury's verdict so as to necessitate judicial inquiry into prejudice. It was thus error for the Nevada Supreme Court not to conduct a prejudice analysis merely because Juror No. 2's police tail did not amount to a "communication . . . about a matter pending before the jury."

## A.

Assuming the truth of Juror No. 2's testimony that he had been followed closely for seven miles on the second day of deliberations,[11] the Nevada Supreme Court concluded that this conduct does not constitute a "communication." On this basis, the Nevada Supreme Court then concluded that any influence was "too speculative" to warrant examination of

Here, the Nevada Supreme Court contravened clearly established federal law by not evaluating whether the external contact was prejudicial.

[11] The trial court specifically found that Juror No. 2 "*testified* he was followed closely, tightly, however you want to state it from Tropicana on US-95 to Las Vegas Boulevard and Carson." The trial court did not discredit Juror No. 2's testimony, and appears to have accepted the allegation as true, at least for the sake of its decision denying Tarango's motion to dismiss. In any event, our review is limited to the Nevada Supreme Court's decision, *see Miles*, 713 F.3d at 486, which assumed that Juror No. 2 was in fact followed.

prejudice. Thus, the Nevada Supreme Court declined to consider whether the conduct in fact influenced the verdict. As set forth above, this decision contravenes the standard clearly established by Supreme Court case law, under which a defendant need not prove a "communication . . . about a matter pending before the jury," or even a "communication" about an unrelated issue. *See Smith* 455 U.S. at 212–15. Only a threshold showing of any "contact," *Remmer*, 347 U.S. at 229, with a "tendency to adverse influence" is required to prompt the court to investigate whether that contact was, in fact, prejudicial. *Mattox*, 146 U.S. at 150.

In light of this, we have little trouble concluding that the contact that the Nevada Supreme Court assumed occurred had enough potential for prejudice to cross *Mattox*'s low threshold. Las Vegas police officers were deeply entangled in this case as victims, witnesses, investigators, and trial spectators. Juror No. 2 testified that he had been closely followed by a marked police car for over seven miles. *See Parker*, 385 U.S. at 365 (observing that government agents "carr[y] great weight with a jury"). Juror No. 2's testimony indicates that the tail was maintained at a distance so close that Juror No. 2 could not see the police vehicle's front wheels or bumper—if true, this conduct could have reasonably been understood as an attempt to intimidate. Moreover, Juror No. 2 was a known hold-out before the contact occurred. The Supreme Court has clearly established that the likelihood of possible prejudice increases where, as here, the jury was previously deadlocked. *See id*.

## B.

Thus, because the state court assumed that the contact did in fact occur and clearly established case law demonstrates

that the contact had a tendency to affect the verdict, the court should have, at a minimum, investigated the prejudice or harmlessness of the contact even if at the time the court was unaware what exactly transpired or whether the impact was harmful. *See Remmer*, 347 U.S. at 229. The Nevada Supreme Court erred when it failed to do so.

Certainly, there may be circumstances in which a trial court finds a juror's allegations of an external contact are unsupported by sufficient evidence, or in which the allegations are so implausible or incredible that they may be reasonably disregarded. There may also be cases in which an alleged external contact suggests paranoia or some underlying mental incompetence on the juror's part. *See Tanner*, 483 U.S. at 118–19. Under those circumstances, a court will not run afoul of the Constitution by refusing to consider whether the alleged contact affected the verdict. But this is not the case on the record before us.

Here, Juror No. 2's testimony was not discredited. To the contrary, crediting Juror No. 2's testimony about a plausible external contact with a juror reluctant to convict, the Nevada Supreme Court declined to consider whether Juror No. 2 may have been prejudiced by the police tail.[12] This contravened

---

[12] The dissent suggests that the cited Supreme Court cases are insufficiently specific to support our holding. *See* Dissent at 41–42. To the contrary, *Mattox* and its progeny set forth a standard that "clearly extend[s]" to the case before us. *See Wright v. Van Patten*, 552 U.S. 120, 123 (2008). Where, as here, contact between a hold-out juror and a government official is shown, a court must investigate possible prejudice. The Nevada Supreme Court's failure to reach the prejudice inquiry was contrary to clearly established federal law.

clearly established federal law.[13] *See Remmer*, 347 U.S. at 229–30; *Mattox*, 146 U.S. at 150; *Smith*, 455 U.S. at 215.

IV.

Because the Nevada Supreme Court failed to consider the prejudicial impact of the contact, in violation of the law clearly established in *Mattox*, we may evaluate Tarango's claim "without deference to the state court's decision" and "unencumbered by the deference AEDPA normally requires."[14] *Panetti*, 551 U.S. at 948; *see also Castellanos*, 766 F.3d at 1146. Reviewing *de novo*, we hold that the Nevada trial court improperly restricted the scope of the evidentiary hearing, effectively preventing Tarango from proving prejudice.

Under our precedent, where an external contact with the jury is shown, a trial court should determine whether the contact "raises a risk of influencing the verdict." *Caliendo*, 365 F.3d at 697. Under such circumstances, prejudice is

---

[13] *Meyer*, which the Nevada Supreme Court relied upon, appears to require the same of Nevada courts. Although *Meyer* rejects "the position that any extrinsic influence is automatically prejudicial," it does not limit the occasions in which a court must consider the possibility of prejudice. *See* 80 P.3d at 455. Rather, because prejudice is not presumed for less egregious contacts, "the extrinsic information must be analyzed in the context of the trial as a whole to determine if there is a reasonable probability that the information affected the verdict." *Id.* at 455–56. *Meyer* does not, however, wholly foreclose a prejudice inquiry in the face of credible allegations of juror misconduct. *Id.*

[14] The dissent cites a number of Ninth Circuit AEDPA cases that were reversed by the Supreme Court, and in which the Supreme Court "chastised us" for ignoring AEDPA's demanding standard. *See* Dissent at 34. These cases have no bearing on the issue presented in this appeal.

presumed and the government bears the burden of rebutting the presumption of prejudice. *Id.* To be sure, "certain chance contacts between witnesses and jury members—while passing in the hall or crowded together in an elevator—may be inevitable." *Id.* at 696 (internal quotation marks and citation omitted). Therefore, if the contact involves a "prosaic" or "more common and less pernicious extraneous influence" than jury tampering, the court should determine whether the jury was "substantially swayed" by the contact.[15] *United States v. Henley*, 238 F.3d 1111, 1115–16 (9th Cir. 2001). Under this circumstance, the defendant bears the burden of offering sufficient evidence to trigger a presumption of prejudice. *See Caliendo*, 365 F.3d at 696–97 (collecting authorities).

Although the anti-impeachment rule, codified as Federal Rule of Evidence 606(b)(1), prohibits juror testimony regarding "any juror's mental processes concerning the verdict," an exception to the rule permits juror testimony about whether "an outside influence was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2)(B). This court has accordingly deemed admissible limited juror testimony to determine "the impact [of an outside influence] upon the juror, and whether or not [the outside influence] was prejudicial." *Remmer*, 347 U.S. at 230; *see also Rutherford*, 371 F.3d at 643–45 (considering juror affidavits including claims that the jury felt intimidated by police officers' glares); *Caliendo*, 365 F.3d at 699 (considering a juror's testimony that the jury's external communication with a

---

[15] The Nevada Supreme Court has identified a similar dichotomy in its own construction of Supreme Court case law prohibiting external influences on criminal juries. *Meyer*, 80 P.3d at 455–56.

police officer left them with a favorable opinion of the officer).

Unlike Nevada law, our precedent instructs that a court should not limit juror testimony to "the existence of [an external contact]." *Rutherford*, 371 F.3d at 644 (quoting the district court in that case). Rather, a court "should [also] consider the 'effect of extraneous information or improper contacts on a juror's state of mind,' a juror's 'general fear and anxiety following' such an incident, and any other thoughts a juror might have about the contacts or conduct at issue." *Id.* (quoting *United States v. Elias*, 269 F.3d 1003, 1020 (9th Cir. 2001)). To that end, consistent with the anti-impeachment rule, this court permits the introduction of limited evidence of a juror's state of mind to prove juror misconduct. A court may not, consistent with the anti-impeachment rule, admit testimony "regarding the affected juror's mental processes in *reaching the verdict*." *Id.* (internal quotation marks omitted) (quoting *Elias*, 269 F.3d at 1020). However, "a juror's testimony concerning his fear that individuals would retaliate against him if he voted to acquit (or convict) would be admissible, although his statement that he actually cast his vote one way or the other because of that fear would not." *Id.*

Consistent with the principles announced in *Rutherford*, the district court should admit Juror No. 2's statements about how the police tail impacted him, although not how it impacted his deliberations and verdict. Therefore, Juror No. 2's statement that he found the police tail "unnerving" is admissible, as are his statements that he "concluded Metro somehow knew who [he] was." By contrast, Juror No. 2's statements that he "relinquished his vote under duress," and "still [has] doubt as an X-Juror" are not admissible.

V.

Because the scope of the evidentiary hearing was narrowly circumscribed in the state trial court, the record before us is insufficient to determine whether the police tail influenced the verdict and prejudiced Tarango. We accordingly remand for the district court to hold an evidentiary hearing and apply the proper standard to determine whether the Nevada courts violated Tarango's due process right to a fair and impartial jury by failing to adequately consider allegations of a prejudicial external influence on the jury. Following this court's precedent, the district court should permit Tarango to offer limited evidence to show prejudice, *see Caliendo*, 365 F.3d at 696–97; *Henley*, 238 F.3d at 1115–16, including evidence of Juror No. 2's "general fear and anxiety" following the police tail, *see Rutherford*, 371 F.3d at 644.

**VACATED AND REMANDED.**

---

RAWLINSON, Circuit Judge, dissenting:

I agree with the majority that *if* a member of the Las Vegas Metropolitan Police Department purposefully tail-gated a holdout juror on the freeway for over seven miles, because the juror was a holdout, such conduct might constitute external jury contact requiring further inquiry from the court. However, the Nevada Supreme Court determined that the juror's assumption that the police officer targeted him

as the holdout juror was speculative and unsubstantiated.[1]  As recognized by the majority, the Nevada Supreme Court expressly found that "there was no evidence of an improper external influence on Juror No. 2. . . ."  *Majority Opinion*, p. 14.  We are bound by that factual determination absent a showing of unreasonableness.  *See* 28 U.S.C. § 2254(d)(2).

Appellant Manuel Tarango moved for a new trial in the state court on the basis of an "outside influence on the jury process."  *Nevada Supreme Court Order*, p. 1.  According to the Nevada Supreme Court, the holdout juror conveyed that "*he thought he had been followed by a police car.*"  *Id.*, p. 2.  (emphasis added).  Because he felt intimidated, the juror changed his vote to guilty from not guilty.

The Nevada Supreme Court also noted that a recent newspaper article attributed the juror's change of heart to the fact that "the other jurors were able to convince the holdout

---

[1] The majority mischaracterizes my description of the state courts' factual determination.  *See Majority Opinion*, p. 22  n.9.  The state court did not discredit, and I did not describe the state courts' finding as discrediting, Juror No. 2's statement that he "thought he was followed by a police car."  *Nevada Supreme Court Order*, p. 2.  What the state courts did discredit, and what I did describe the state courts as finding, was a lack of substantiation that the police car was following Juror No. 2 on the freeway because he was a holdout juror.  There was insufficient evidence in the state courts' view that a tail-gating police officer in rush-hour morning traffic constituted an improper external influence.  Rather than focusing on whether Tarango submitted evidence of an external influence, *see, e.g.*, *Mattox v. United States*, 146 U.S. 140, 141–44 (inflammatory newspaper article read to the jury); *Remmer v. United States (Remmer I)*, 347 U.S. 227, 228 (1954) (juror told he could profit from favorable verdict), the majority concludes that the existence of police tail-gating during rush hour traffic, and nothing more, compelled the state court to conduct a prejudice inquiry.

to convict. . . ." *Id*., p. 4.  After discussing the juror's email to the trial judge and the juror's follow-up letter, the Nevada Supreme Court concluded that the trial court properly excluded from consideration the juror's emails to the trial judge and defense counsel under N.R.S. 50.065(2) and the Nevada case of *Meyer v. State*, 80 P.3d 447 (Nev. 2003).

Nevada Revised Statute 50.065(2) provides:

Upon an inquiry into the validity of a verdict or indictment:

(a) A juror shall not testify concerning the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.

(b) The affidavit or evidence of any statement by a juror indicating an effect of this kind is inadmissible for any purpose.

In *Meyer*, the Nevada Supreme Court interpreted N.R.S. 50.065.  Initially, the court referenced Federal Rule of Evidence 606(b), which it identified as an embodiment of "the long-standing common-law rule against admission of jury testimony to impeach a verdict . . ."  80 P.3d at 454 & n.20 (citations and internal quotation marks omitted).  The court also noted that N.R.S. 50.065 was "substantially the same" as the federal rule.  *Id*. at n.20.

Importantly, the Nevada Supreme Court made a distinction between juror misconduct and jury tampering. *See*

*id*. at 454–55. Citing Supreme Court authority, the court identified extraneous influence as jury tampering rather than juror misconduct. *See id*. at 455 (citing *Remmer I*; *see also Remmer v. United States (Remmer II)*, 350 U.S. 377 (1956)).

Under this framework established by its precedent, the Nevada Supreme Court ruled that, after excluding the inadmissible evidence of the juror's state of mind and of the deliberative process of the jury, there was insufficient evidence that the juror committed misconduct. *See Nevada Supreme Court Order*, p. 6.

The Nevada Supreme Court then turned to the asserted extraneous influence of a police car following the juror on the freeway.[2] Admittedly, the court couched its analysis in terms of whether being followed by a police car constituted a "communication." *Id*., p. 7. Nevertheless, the court ultimately concluded that "the alleged external influence in the case at bar was far too speculative to sustain a motion for a new trial." *Id*. It is this conclusion that is reviewed under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

In the last ten years, the United States Supreme Court has repeatedly rebuked this Circuit for attempting to make end-runs around the formidable obstacles to review contained in the AEDPA. As the majority acknowledges, habeas relief

---

[2] The majority takes judicial notice of a roadmap of Las Vegas, Nevada to approximate the distance involved as 7.5 miles. *See Majority Opinion*, p. 12 n.5. The majority should have also taken notice that US-95 is the only freeway that accesses downtown from east on Tropicana Boulevard, and therefore it would not be unusual for a police officer to take that route to police headquarters downtown.

under the AEDPA is available only if the decision of the state court decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or . . . was based on an unreasonable determination of the facts in light of the evidence presented at the State Court proceeding." *Majority Opinion*, p. 16 (quoting 28 U.S.C. § 2254(d)(1)–(2)) (internal quotation marks omitted). Despite our recurring acknowledgment of this demanding standard, the Supreme Court has constantly chastised us for failing to take our professed acknowledgment to heart. In *Glebe v. Frost*, 135 S. Ct. 429, 431 (2014), the Court observed that we acknowledged its ruling, "but tried to get past it." Similarly, in *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014), the Court chided this Circuit for "attempt[ing] to evade [the] barrier" established by the AEDPA.[3]

In *Nevada v. Jackson*, 133 S. Ct. 1990, 1993 (2013), the Court reversed us for relying on a decision that was "very far afield." Unfortunately, the majority opinion again strays from the narrow confines of appropriate habeas review. Rather than reviewing the state court's determination that proof of the alleged external influence was too speculative to constitute jury tampering, the majority grants habeas relief on the basis that the Nevada Supreme Court "improperly limited its inquiry to whether the external contact amounted to a communication," contrary to *Mattox v. United States*, 146 U.S. 140 (1892). *Majority Opinion*, p. 4 (internal quotation marks omitted). The majority then proceeds to "review *de*

---

[3] The majority makes light of the many rebukes we have received from the Supreme Court for ignoring the demanding standard under which we review habeas cases. *See Majority Opinion*, p. 27 n.14. I doubt the Supreme Court will be amused.

*novo* the question whether the extrinsic contact *could have influenced* the verdict and prejudiced Tarango." *Id*. at 4. (emphasis added). Finally, the majority remands "for an evidentiary hearing and further fact finding." *Id.*

There are three problems with the majority's analysis. The first is that *Mattox* is "far afield" from the dispositive issue in this case. *Jackson*, 133 S. Ct. at 1993. The second is that the majority gives no deference to the decision of the Nevada Supreme Court, but rather engages in impermissible appellate factfinding. The third is that no Supreme Court case supports the majority's conclusion. I will address each problem in turn.

## 1. Reliance on *Mattox*

*Mattox*, a case decided in 1892, is notable not only for its age and obvious pre-dating of the AEDPA, but for its unremarkable holding. In *Mattox*, the United States Supreme Court addressed the denial of a motion for a new trial made by a defendant who was tried in *federal* court. *See* 146 U.S. at 141. The basis of the motion was the reading of an inflammatory newspaper article to jurors during their deliberations, as well as prejudicial comments made to jurors by the bailiff. *See id*. at 143–44, 151.

The Supreme Court observed that the affidavits submitted by the jurors were properly received because they refrained from articulating "what influence, if any, the communication of the bailiff and the reading of the newspaper had upon them, but confined their statements to what was said by the one [the bailiff] and read from the other [the newspaper]." *Id*. at 147. The Court emphasized that the extraneous influences

were "open to the knowledge of all the jury, and not alone within the personal consciousness of one." *Id*. at 149.

The Court held that "*[p]rivate communications*, possibly prejudicial, between jurors and third persons . . . or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Id*. at 150 (emphasis added). However, the Court also provided that any assertion of jury tampering was "subject to rebuttal by the prosecution; or *contingent on proof indicating that a tampering really took place*." *Id*. at 149–50 (citations omitted) (emphasis added).

In *Mattox*, the existence of the extraneous influence was undisputed. The Supreme Court summarized the newspaper article as stating:

> that the defendant had been tried for his life once before; that the evidence against him was claimed to be very strong by those who had heard all the testimony; that the argument for the prosecution was such that the defendant's friends gave up all hope of any result but conviction; and that it was expected that the deliberations of the jury would not last an hour before they would return a verdict . . .

*Id*. at 150–51.

The Court described the extraneous statement from the bailiff as informing the jury "that this was the third person Clyde Mattox had killed . . ." *Id*. at 151.

Considering these facts, it is unremarkable that the Supreme Court held that the undisputed evidence of jury tampering warranted the grant of a new trial. However, nothing in the holding or reasoning of *Mattox* supports the majority's disregard of the state court's determination that Tarango's evidence of jury tampering was speculative. The majority cites *Mattox* for the proposition that the trial court was compelled to "consider the prejudicial effect of *any* external contact that has a 'tendency' to influence the verdict. . . ." *Majority Opinion*, p. 18. However, the majority's analysis conveniently omits the discussion in *Mattox* of the undisputed evidence that established, without challenge, the existence of the external contact. *See Mattox*, 146 U.S. at 150–51. The majority also elides the language in *Mattox* explaining that relief is "contingent on proof indicating *that a tampering really took place*." *Id*. at 149–50 (citations omitted) (emphasis added). Unlike in *Mattox*, the evidence submitted by Tarango was disputed. Indeed, the prosecutor denied providing the identity of the holdout juror to anyone at the Police Department. Having reviewed the testimony presented to the trial court, the Nevada Supreme Court agreed with the trial court that the evidence of jury tampering was speculative in the absence of evidence that the identity of the holdout juror was provided to anyone in the Police Department. This determination was entirely consistent with the requirement in *Mattox* of proof that jury tampering actually occurred.

It cannot be fairly said that *Mattox* compels consideration of the prejudicial effect of *speculative* evidence of jury tampering. Rather, as with other factual determinations, the existence of jury tampering is a matter to be resolved by the trial court. *See Uttecht v. Brown*, 551 U.S. 1, 17, 20 (2007) (explaining that "it is the trial court's ruling that counts" due

to its ability to perceive the demeanor of the witnesses).  The
trial court conducted an evidentiary hearing, and determined
that the allegation of jury tampering was "vague" and
"ambiguous" and "nonspecific."    The Nevada Supreme
Court's affirmance of the trial court's determination that the
evidence of jury tampering was "speculative" was not
contrary to *Mattox* because the holding of *Mattox* is "far
afield" from the facts of this case. *Jackson*, 133 S. Ct. at
1993.

The majority also relies on our decision in *United States
v. Armstrong*, 654 F.2d 1328, 1331–33 (9th Cir. 1981).
However, that case is more helpful to the dissent than to the
majority.  In that case, a juror reported that her husband had
taken two calls using obscene language and directing the
husband to "[t]ell your wife to stop hassling my brother-in-
law at court." *Id*. at 1331.  On direct appeal, we determined
that an outside influence must be present to raise the
presumption of prejudice. *See id*. at 1332.  That is where the
majority's analysis falters, because the Nevada state courts
*never* found that an external influence was exerted upon Juror
No. 2.  At most, the courts assumed the juror was followed,
but did not link the asserted tail-gating to Juror No. 2's status
as a holdout juror.  Tail-gating an individual who is not
known to be a holdout juror, or a juror at all, would not have
a "tendency" to influence the jury's verdict, and would not
prompt a prejudice inquiry. *Mattox*, 146 U.S. at 150–51.[4]

---

**4** Curiously, the majority opinion implies that a newspaper article is not
a "communication." *Majority Opinion*, p. 18.  Nothing could be further
from the truth. *See Hillard v. Arizona*, 362 F.2d 908, 909 (9th Cir. 1966)
(noting that the Judge admonished jurors "to avoid out of court
communications . . . including newspaper articles).

The other cases cited by the majority as clearly established Federal law are similarly "far afield." In *Remmer I*, 347 U.S. at 228–29, unlike in this case, the allegations of jury tampering were unchallenged by the prosecution, yet the district court denied the motion for a new trial. On direct appeal, the United States Supreme Court remanded the case for a hearing on prejudice. *See id*. at 229–30. Not only is this case "far afield" because it did not involve habeas review. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011) (clarifying that a case offers no guidance for habeas review under the AEDPA if the court did not apply AEDPA deference); *see also Harrington v. Richter*, 562 U.S. 86, 101 (2011). The allegations were also unchallenged, and the trial court failed to conduct a hearing. *See Remmer I*, 347 U.S. at 228–29; *see also Parker v. Gladden*, 385 U.S. 363, 364–65 (1966) (allegations unrefuted).

In *Smith v. Phillips*, 455 U.S. 209, 215 (1982), the Supreme Court held that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias. . . ." That is precisely what occurred in the state court. Tarango had the opportunity to prove the allegations, and the state courts determined that his proof was inadequate. That should be the end of the matter under habeas review. *See Premo v. Moore*, 562 U.S. 115, 131 (2011).

## 2. Failure to defer to the Nevada Supreme Court

The Supreme Court has consistently and repeatedly stressed our obligation on habeas review to defer to the rulings and factual determinations made by the state courts. *See Uttecht*, 551 U.S. at 10 ("By not according the required deference, the Court of Appeals failed to respect the limited

role of federal habeas relief in this area prescribed by Congress and by our cases."); *see also Jackson*, 133 S. Ct. at 1994 (referencing the "substantial deference" required by AEDPA); *Cavazos v. Smith*, 132 S. Ct. 2, 7 (2011) (mentioning Supreme Court opinions "highlighting the necessity of deference to state courts in § 2254(d) habeas cases"); *Pinholster*, 131 S. Ct. at 1398 (describing the "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (citation omitted); *Richter*, 562 U.S. at 104 (reversing this Circuit for "a lack of deference to the state court's determination and an improper intervention in state criminal processes, contrary to the purpose and mandate of AEDPA and to the now well-settled meaning and function of habeas corpus in the federal system").

The trial court determined that Tarango failed to adequately establish that jury tampering occurred, due to the speculative, vague, ambiguous and disputed nature of the allegations that a police officer identified Juror No. 2 as the holdout juror and tail-gated that juror for over seven miles. Although the trial court could have credited the juror's version of events over the prosecution's rebuttal, it did not do so. Rather than deferring to the state court's determination, the majority engaged in its own factfinding, stating that: "[W]e have little trouble concluding that the contact that the Nevada Supreme Court assumed occurred had enough potential for prejudice to cross *Mattox's* low threshold. . . ." *Majority Opinion*, p. 25.[5]

---

[5] The majority completely ignores the fact that the state court *never* found that the police officer was aware of the identity of the holdout juror. For that reason, the state court merely assumed that there was a tail-gating,

The majority's disregard of the state court's determination and substitution of its alternate conclusion strays from our appointed role on habeas review. *See Richter*, 562 U.S. at 104.

### 3. No supporting Supreme Court authority

Under the rule expressed by the majority, a trial court would have to conduct a prejudice analysis whenever an allegation of jury tampering is made, even if the trial court ultimately determines that the allegation is unsubstantiated. *See Majority Opinion*, p. 22 n.9 (discounting the trial court's determination that the allegation of jury tampering was "ambiguous, vague and nonspecific") (internal quotation marks omitted).

No Supreme Court precedent supports the majority's rationale. As previously noted, *Remmer I* and *Mattox* involved undisputed evidence of extraneous influence. *See Remmer I*, 347 U.S. at 229; *see also Mattox*, 146 U.S. at 151. *Smith* merely stands for the proposition that the defendant asserting jury tampering must be afforded a hearing. *See* 455 U.S. 215. It is without question that Tarango was afforded a hearing. So we are left with the majority's premise untethered to any controlling Supreme Court authority. Rather, *Mattox* expressly points in the other direction,

---

not that there was "external contact." The assumption of "external contact" is made by the majority.

requiring proof that jury tampering actually occurred.  *See* 146 U.S. at 149–50.**[6]**

The Supreme Court has addressed the tendency of this Circuit to reach beyond the confines of Supreme Court precedent.  In *Lopez*, 135 S. Ct. at 4, the Supreme Court scolded us for relying on "older cases that stand for nothing more than [a] general proposition."   Here, the majority similarly cites older cases standing for the general proposition that a defendant is entitled to a hearing when jury tampering is asserted, and a determination of prejudice when jury tampering has been established.  *See Remmer I*, 347 U.S. at 228–29; *see also Smith*, 455 U.S. at 215.  Just as in *Lopez*, "[n]one of [the Supreme Court] decisions that the [majority] cited addresses, even remotely, the specific question presented by this case."   135 S. Ct. at 4 (citations omitted). The specific question in this case is whether the trial court is required to conduct a prejudice inquiry when that court has determined that the allegations of jury tampering are "ambiguous, vague and nonspecific."  The majority has cited no Supreme Court case addressing this specific question.**[7]**

---

**[6]** The majority accuses me of missing the point, *see Majority Opinion*, p. 23 n.10, but it is the majority that is off-base.  The state courts NEVER "presumed an unauthorized external contact with a juror had occurred." *Id.*  The most the state courts assumed was that a police car tail-gated Juror No. 2 during morning rush-hour traffic on the only freeway that accesses downtown from east Tropicana Boulevard.   The majority presumes the rest.

**[7]** The majority takes issue with, and in the process implicitly concedes, my point that the Supreme Court cases relied upon by the majority "are insufficiently specific."  *Majority Opinion*, p. 26 n.12.  In the very next sentence, the majority seeks to "extend" the standards set forth in "*Mattox* and its progeny."  *Id*.  However, the Supreme Court has expressly instructed us against extending its precedent beyond its specific holdings.

Consequently, the Nevada Supreme Court decision could not have been contrary to federal law under the AEDPA. *See Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("With no Supreme Court precedent establishing [the standard adopted by the panel], habeas relief cannot be granted pursuant to § 2254(d)(1) based on such a standard. . . .").

## CONCLUSION

I have no quarrel with the notion that we must faithfully adhere to the panoply of procedural protections afforded the criminal defendant. However, on habeas review, we are cabined by the deference owed to state court decisions and by the requirement that relief be granted only if the decision of the state court was contrary to established Supreme Court authority. *Mattox* is not that authority in this case.

The Supreme Court has repeatedly reminded us that the standard for relief on habeas review "is difficult to meet . . . because it was meant to be. . . ." *Richter*, 562 U.S. at 102. Federal habeas review "is a guard against *extreme malfunctions* in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . ." *Id*. (citation and internal quotation marks omitted) (emphasis added). Rather than applying the "difficult" habeas standard, at best the majority engages in "ordinary error correction." *Id*.

---

*See White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) ("[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established . . .") (citation and internal quotation marks omitted).

Because the majority cites no applicable Supreme Court authority to support its grant of habeas relief, because the majority completely disregards the findings of the state courts, and because the majority fails to adhere to the confines of habeas review, I respectfully dissent.