**Gregory Dean CALIENDO,
Petitioner–Appellant,**

v.

**WARDEN OF CALIFORNIA MEN'S
COLONY, Respondent–Appellee.**

No. 01–56946.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 2003.

Filed Jan. 9, 2004.

Withdrawn March 29, 2004.

Filed April 5, 2004.

Kenneth M. Miller, San Clemente, CA, for the appellant; Gregory Dean Caliendo, pro se, petitioner-appellant.

Michael R. Johnsen and David F. Glassman, Deputies Attorney General, Los Angeles, CA, for the appellee.

Before: HALL, O'SCANNLAIN, and McKEOWN, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Petitioner Gregory Caliendo appeals the district court's denial of his petition for writ of habeas corpus. He contends that the California Court of Appeal's decision upholding his conviction was contrary to Supreme Court precedent because the court did not presume prejudice from an incident of juror misconduct. A detective who provided testimony that was crucial to the prosecution's case had a twenty-minute conversation, factually unrelated to the trial, with three jurors in the hallway during a break in deliberations.

We exercise jurisdiction under 28 U.S.C. § 2253 and 28 U.S.C. § 1291. We hold that the state appellate court's decision was contrary to *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), in that the court did not apply a rebuttable presumption of prejudice. The state trial court did not presume prejudice either, so we review *de novo* the question whether the government clearly established that the extrinsic contact was harmless. We answer in the negative and, accordingly, grant the petition.

## I. FACTS

After a Los Angeles County Superior Court jury convicted him of second-degree auto burglary in violation of California Penal Code section 459, Caliendo was sentenced to a state prison term of twenty-five years to life in accordance with California's three strikes law. His conviction resulted from a second trial; the jury in Caliendo's first trial hung 7–5 in favor of acquittal.

The central issue at both trials was whether Caliendo broke into a locked parked car—an essential element of auto burglary—or whether the car had previously been broken into when he entered it. Caliendo was arrested at 12:30 a.m. on July 22, 1995. Two sheriff's deputies noticed someone sitting in the passenger seat of a GMC Suburban in a park and ride lot. Moments later, the deputies shined a spotlight on the car, approached it on foot, and illuminated the interior with their flashlights. They reported seeing Caliendo lying on his side with his head under the driver's side dashboard and a screwdriver in his right hand. A window on the passenger side was broken. The front and back doors on the passenger side were unlocked. When Caliendo stepped out of the vehicle, the deputies found the screwdriver and a large rock on the floor. The car had been parked there for two days. The owner was shown his car in the impound lot. He said that the rear right speaker had been unscrewed and that the car's sun visors and light bar were missing, along with an overnight bag containing clothes and about $30. Caliendo possessed none of these items when he was taken into custody directly from the car. He told the two deputies that he did not break into the car but that it was unlocked and he crawled inside it to go to sleep.[1]

The only evidence that Caliendo broke into the car was supplied by a police detective, John Mundell, who testified that Caliendo confessed this to him two days after the arrest, on July 24, 1995. According to Mundell, Caliendo said that following an argument his wife dropped him off at the intersection near the park and ride lot between 11 p.m. and midnight on the night of his arrest. Mundell testified that Caliendo said he got cold and needed a place to sleep, so he broke the Suburban's window by smashing it three times with a large rock, unlocked the door, crawled inside, and went to sleep. Caliendo denied having a screwdriver in his hand when the deputies found him.

Mundell, an officer with eight years' experience, sat at the prosecution table throughout the trial. He was overheard talking to three jurors in the hallway outside the courtroom for approximately twenty minutes while they waited to enter the courtroom after a lunch recess during deliberations in Caliendo's second trial.

The trial judge immediately conducted an evidentiary hearing. Mundell and the jurors testified that they did not discuss anything related to the trial. The topics of conversation included baseball, eating, a juror's neighbor, Mundell's exercise habits and equipment, and his heavy police workload:

"THE COURT: Mr. 005, what were you talking about?

JUROR NO. 5: We talked about the amount of paperwork on Detective Mundell's desk top and his exercise regime and the fact that he doesn't have a television in his house where he works out.

---

1. The trial court in Caliendo's second trial applied the hearsay rule to prevent the jury from hearing the deputies' testimony about this statement. The jury in the first trial was permitted to hear the testimony.

THE COURT: Mr. 004, what were you talking about?

JUROR NO. 4: We talked about eating, and he has to pay so much money to eat here all the time, and that he's doing a good job as an officer; in other words, I wouldn't want to be in his possession [sic] to be a cop or officer. I was talking about baseball. I was talking about my neighbor. That's it. Just surface talk.

THE COURT: Ms. 022, what were you talking about?

JUROR NO. 9: I asked him how long he thought it would be before we would get back into court to start deliberating."

At the evidentiary hearing, the judge questioned all the jurors one by one as to whether the conversation would influence their judgment or cause them to view Mundell's testimony any differently. All the jurors testified that the conversation would not affect their deliberations.

Caliendo moved for a mistrial. The judge denied the motion as follows:

"THE COURT: [The jurors] have all indicated ... that the conversation that they had with Detective Mundell will not influence their judgment in this case as to Mr. Caliendo. I will accept their representations. I accept everybody's representation. I've heard no indication whatsoever that anything about the facts of the case or any of the parties in this case were discussed whatsoever. I know what you're saying. It's a very unfortunate situation. It should not have happened but it did happen. Detective Mundell should know better. He certainly should have known better.

"But I will accept the jurors at their word that they will not let whatever conversation they had with Detective Mundell influence their judgment in the case as to whether or not Mr. Caliendo, based upon the evidence that has been introduced here in court, is either guilty or not guilty of these charges. So the motion for a mistrial will be denied."

The jury began deliberating shortly before the noon recess on Thursday, August 8, 1996. During deliberations the jury sent out a note requesting that portions of Mundell's testimony be reread. On Monday, August 12, it returned with a guilty verdict. The judge denied Caliendo's subsequent motion for a new trial.

Caliendo appealed. The California Court of Appeal observed that the conversation with Mundell was "improper and fraught with the danger of improper influence and communication of extraneous information." Nevertheless, the court rejected Caliendo's juror misconduct claim on the grounds that he had not established actual prejudice on the facts. The California Supreme Court denied review.

Caliendo then filed a petition for writ of habeas corpus. The district court, adopting the report and recommendation of the Magistrate Judge, denied the petition on its merits with prejudice. The report and recommendation emphasized that the improper conversation was an "isolated incident" and did not concern the trial. The district court, however, granted a certificate of appealability with respect to the question whether prejudice should be presumed where three jurors had an improper twenty-minute conversation, factually unrelated to the trial, with a key prosecution witness.

## II. STANDARD OF REVIEW

We review *de novo* a district court's decision to deny a habeas petition. *McClure v. Thompson,* 323 F.3d 1233, 1240 (9th Cir.2003). We review *de novo* allegations of juror misconduct and prejudicial impact in habeas cases. *Rodriguez v. Marshall,* 125 F.3d 739, 744 (9th Cir.1997).

We presume state court findings of fact to be correct unless the petitioner rebuts them with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), a petitioner for writ of habeas corpus must demonstrate that the state court's adjudication on the merits resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented." The state court's decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (*quoting Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). The state court's decision involves an "unreasonable application of" clearly established federal law if the state court identifies the correct governing legal principle from the decisions of the Supreme Court, but unreasonably applies that principle to the facts of the case. *Williams*, 529 U.S. at 407–08, 120 S.Ct. 1495.

## III. ANALYSIS

Caliendo maintains that the California Court of Appeal's decision was contrary to clearly established Supreme Court law because the court did not presume prejudice in evaluating the impact of the conversation between Detective Mundell and the three jurors. We agree that the state court's analysis was framed erroneously and grant the habeas petition based on our independent review of the record.

More than a century ago, in *Mattox v. United States*, 146 U.S. 140, 142, 13 S.Ct. 50, 36 L.Ed. 917 (1892), the Supreme Court overturned a murder conviction on Sixth Amendment grounds in part because the bailiff had told the jury during deliberations that "this is the third fellow [the defendant] has killed." The *Mattox* Court announced that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Id.* at 150, 13 S.Ct. 50.

In *Remmer v. United States*, 347 U.S. 227, 228, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Supreme Court reversed a conviction under *Mattox* when it was shown that during the trial someone had told the jury foreman that he could profit by acquitting the defendant. The Court in *Remmer* held that *Mattox's* "presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id.* at 229, 74 S.Ct. 450.[2]

**2.** In *Turner v. Louisiana*, 379 U.S. 466, 473–74, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), the Supreme Court applied a conclusive presumption of prejudice to overturn a murder conviction where two deputy sheriffs who provided key testimony relating to substantive evidence of the defendant's guilt were engaged in "a continuous and intimate association" with the jury throughout the trial. *Turner* and its progeny do not apply directly to our analysis because the extrinsic contact in this case was neither continuous nor intimate. Still, *Turner* informs our analysis to the extent it held that an extrinsic contact with a juror need not relate to the trial in order to create the potential for prejudice.

We and other circuits have held that *Mattox* established a bright-line rule: Any unauthorized communication between a juror and a witness or interested party is presumptively prejudicial, but the government may overcome the presumption by making a strong contrary showing. *United States v. Armstrong*, 654 F.2d 1328, 1331–33 (9th Cir.1981) (upholding guilty verdicts but applying the *Mattox* presumption where a juror's husband had taken two obscene phone calls at home from an unidentified third party who said, "Tell your wife to stop hassling my brother-in-law at court"). *See also United States v. O'Brien*, 972 F.2d 12, 13–15 (1st Cir.1992) (upholding a guilty verdict but applying the *Mattox* presumption where a police officer who was a potential prosecution witness, but who did not testify, spoke with three jurors during a recess about matters unrelated to the case); *United States v. Williams*, 822 F.2d 1174, 1188 (D.C.Cir.1987) (upholding a guilty verdict but stating that the *Mattox* presumption is "operable even if the communication at issue consisted only of 'banter' not clearly directed at influencing the jury's verdict"), *superseded on other grounds by rule as stated in United States v. Caballero*, 936 F.2d 1292, 1298–99 (D.C.Cir.1991); *United States v. Betner*, 489 F.2d 116, 117–19 (5th Cir.1974) (ordering a new trial under *Mattox* because the prosecutor conversed with the jury panel during a recess and the trial court failed to conduct an adequate hearing).

The *Mattox* rule serves an important function in our system of justice. It protects and safeguards defendants' Sixth Amendment rights to a fair trial and to confront and cross-examine witnesses. *See Rinker v. County of Napa*, 724 F.2d 1352, 1354 (9th Cir.1983) (applying the *Mattox* rule to a civil action and stating that the "harm inherent in deliberate contact or communication can take the form of subtly creating juror empathy with the party and reflecting poorly on the jury system"); *Agnew v. Leibach*, 250 F.3d 1123, 1133 (7th Cir.2001) (because of an extrinsic contact, the jury "had the opportunity to develop confidence in [the witness's] word in ways that were not subject to cross-examination or the right of confrontation"); *United States v. Harry Barfield Co.*, 359 F.2d 120, 124 (5th Cir.1966) ("Our system of trial by jury presupposes that the jurors be accorded a virtual vacuum wherein they are exposed only to those matters which the presiding judge deems proper for their consideration. This protection and safeguard must remain inviolate if trial by jury is to remain a viable aspect of our system of jurisprudence. Any conduct which gives rise to an appearance of evil must be scrupulously avoided.").

At the same time, the Supreme Court has recognized that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Indeed, "certain chance contacts between witnesses and jury members—while passing in the hall or crowded together in an elevator—may be inevitable." *Gonzales v. Beto*, 405 U.S. 1052, 1058, 1055, 92 S.Ct. 1503, 31 L.Ed.2d 787 (1972) (memorandum dissent and concurrence). Given this reality, if an unauthorized communication with a juror is *de minimis*, the defendant must show that the communication could have influenced the verdict before the burden of proof shifts to the prosecution. "A defendant must offer sufficient evidence to trigger the presumption of prejudice ..." *United States v. Day*, 830 F.2d 1099, 1103–04 (10th Cir.1987) (a juror and a federal agent who sat at the prosecutor's table exchanged a "casual, time-of-the-day

greeting" in the men's room). *See also Lee v. Marshall,* 42 F.3d 1296 (9th Cir. 1994) (two police officers, one of them the investigating officer in the case, entered the jury room during deliberations without the court's permission to set up a VCR to replay a witness's testimony); *Johnson v. Wainwright,* 778 F.2d 623 (11th Cir.1985) (sheriff had a dual role as bailiff and assistant to the prosecution); *Helmick v. Cupp,* 437 F.2d 321 (9th Cir. 1971) (three arresting sheriff's deputies, one of them a prosecution witness, drove the jurors to the scene of the crime after being designated by the trial court as bailiffs for that purpose).

■ The *Mattox* rule applies when an unauthorized communication with a juror crosses a low threshold to create the potential for prejudice. A communication is possibly prejudicial, not *de minimis,* if it raises a risk of influencing the verdict. Prejudice is presumed under these circumstances, and the defendant's motion for a new trial must be granted unless the prosecution shows that there is no reasonable possibility that the communication will influence the verdict. *See O'Brien,* 972 F.2d at 14; *United States v. Dutkel,* 192 F.3d 893, 899 (9th Cir.1999).[3]

The California Court of Appeal did not identify or apply the clearly established *Mattox* rule. The court relied on the California Supreme Court's decision in *People v. Cobb,* 45 Cal.2d 158, 287 P.2d 752 (1955), to hold that no presumption of prejudice applied in Caliendo's case because the improper conversation did not directly relate to the trial. Instead of requiring the government to clearly establish that no preju-

dice resulted from the incident, the court placed the burden on the defendant to prove prejudice. In an unpublished opinion, the court found that he had not done so. "The record as a whole discloses no reasonable probability of actual harm to appellant," the Court of Appeal concluded. "No topic discussed by Mundell and Jurors 4 or 5 had any tendency to reflect upon or bolster Mundell's credibility, and every juror said that he or she would not be influenced by the conversation between Mundell and members of the jury."

■ The state court's failure to presume prejudice on this record was contrary to *Mattox.* The *Mattox* Court spoke in categorical terms, mandating that "possibly prejudicial" out-of-court communications between jurors and outside parties "invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox,* 146 U.S. at 150, 13 S.Ct. 50. Nothing in *Mattox* suggests that for the rebuttable presumption of prejudice to attach, the substance of the extrinsic contact must factually relate to the trial. Rather, "[i]n questions about jury incidents, we are ultimately not so concerned with their nature as with the prejudice they may have worked on the fairness of the defendant's trial." *Armstrong,* 654 F.2d at 1332; *see Rodriguez,* 125 F.3d at 744 n. 4.

■ Whether an unauthorized communication between a juror and a third party concerned the case is but one factor in determining whether the communication raised a risk of influencing the verdict. Other factors may include the length and nature of the contact, the identity and role at trial of the parties involved, evidence of

---

**3.** Despite the government's contention, the Supreme Court's decision in *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), did not signal a retreat from *Mattox's* well-settled rule. The Court in *Olano* merely commented that whether or not

a rebuttable or conclusive presumption of prejudice applies in a case involving an intrusion upon a jury, a reviewing court is required to evaluate the actual extent of prejudice. *Id.* at 738–39, 113 S.Ct. 1770.

actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction. In weighing these factors we generally accord some deference to the findings of the trial judge, who is in the best position to determine whether possibly prejudicial misconduct took place and, if so, whether the government clearly established harmlessness. *See Williams*, 822 F.2d at 1188–89. But no deference is warranted where, as here, an extrinsic contact was possibly prejudicial but the trial judge neglected to hold the government to its heavy burden of proving that the contact was clearly not prejudicial.[4]

This contact was possibly prejudicial because Detective Mundell was a critical prosecution witness and his interaction with multiple jurors lasted for twenty minutes. Although the conversation did not directly concern the trial, it went beyond "a mere inadvertent or accidental contact involving only an exchange of greeting in order to avoid an appearance of discourtesy." *Harry Barfield*, 359 F.2d at 124. Mundell's recollection of Caliendo's confession was the only evidence that Caliendo broke into the car, and the case was close enough that Caliendo's first jury hung. The Magistrate Judge's report recognized that the unauthorized communication between Mundell and the jurors created the "potential for prejudice." Thus, because the communication raised a risk of prejudice, the California Court of Appeal's failure to apply a rebuttable presumption of prejudice was contrary to the governing law set forth by the Supreme Court in *Mattox*.

■■■ The state courts determined that no prejudice resulted from the incident, yet we may not defer to this finding. AEDPA's presumption of correctness does not apply to state court findings arrived at through the use of erroneous legal standards. *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir.2002). The state appellate court employed an incorrect standard when it placed the burden of proof on the defendant instead of the government. The state trial court conducted an evidentiary hearing, consistent with *Remmer*, 347 U.S. at 229–30, 74 S.Ct. 450, and denied the defendant's motions for mistrial and new trial with a finding that the improper conversation did not influence the jurors. But the trial judge failed to presume prejudice in his rulings, so "we need not—indeed, should not—give deference" to his finding on prejudice—a mixed question of law and fact. *Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir.2000). We review *de novo* whether the government showed that there was no reasonable possibility that the communication influenced the verdict.

■■■ We hold that the government did not make a strong showing that the contact between Detective Mundell and the three jurors was harmless. While the twenty-minute conversation was seemingly innocuous, the case was close. And it turned on the detective's credibility. The jury even requested a read-back of Mundell's testimony as to damaging statements Caliendo had allegedly made to him. The

---

4. "[W]hen jury misconduct is alleged in the defendant's motion for new trial, the trial judge has a duty to take the following actions: he must conduct a full investigation to ascertain whether the alleged jury misconduct actually occurred; if it occurred, he must determine whether or not it was prejudicial; unless he concludes that it was clearly not prejudicial, he must grant the motion for new trial; if he concludes that it did not occur or that it was clearly not prejudicial, he must spell out his findings with adequate specificity for meaningful appellate review." *United States v. McKinney*, 429 F.2d 1019, 1026 (5th Cir.1970).

report and recommendation adopted by the district court noted that "some evidence suggested that the car may have already been broken into before Petitioner entered it, that is, none of the missing property was found at the scene or in Petitioner's possession when he was taken into custody directly from the vehicle." Given the conflicting evidence in Caliendo's case and the centrality of Mundell's testimony to the prosecution, the jurors' claims that the encounter would not influence them did not suffice to meet the government's heavy burden of proving harmlessness. The prejudicial effect of an extrinsic contact "may be substantial even though it is not perceived by the juror, and 'a juror's good faith cannot counter this effect.'" *Jeffries v. Wood*, 114 F.3d 1484, 1491(9th Cir.1997) (*en banc*) (*quoting United States v. Williams*, 568 F.2d 464, 471 (5th Cir. 1978)).

At Caliendo's first trial seven jurors voted to acquit. At his second trial three deliberating jurors chatted amiably and at length with the critical prosecution witness in an uncontrolled setting. Detective Mundell discussed his heavy workload with the three jurors and established common ground with them. After the conversation Juror 4 expressed a positive view of the detective: "We talked about ... that he's doing a good job as an officer."

The government failed to clearly establish that the improper conversation did not affect the verdict by bolstering the detective's credibility or "creating juror empathy." *Rinker*, 724 F.2d at 1354. We therefore conclude that Caliendo must be released or granted a new trial within seventy days of the issuance of this Court's mandate.

**REVERSED AND REMANDED.**