**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ENRIQUE ANTHONY GODOY, *Petitioner-Appellant*, <br><br> v. <br><br> MARION SPEARMAN, *Respondent-Appellee.* | No. 13-56024 <br><br> D.C. No. 2:10-cv-07927-R-AGR <br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted En Banc March 22, 2017
San Francisco, California

Filed June 30, 2017

Before: Sidney R. Thomas, Chief Judge, and Kim McLane
Wardlaw, Raymond C. Fisher, Ronald M. Gould, Marsha
S. Berzon, Johnnie B. Rawlinson, Milan D. Smith, Jr.,
N. Randy Smith, Paul J. Watford, Andrew D. Hurwitz and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Fisher

# SUMMARY[*]

## Habeas Corpus

The en banc court reversed the district court's judgment denying a habeas corpus petition in which Enrique Anthony Godoy, who was convicted of second-degree murder, claimed improper outside influence on the jury.

The en banc court held that the California Court of Appeal – which acknowledged juror misconduct and a presumption of prejudice, but concluded that the presumption was rebutted and refused to hold an evidentiary hearing – acted contrary to clearly established law:

(1) by never requiring the state to rebut the presumption of prejudice, as required by *Mattox v. United States*, 146 U.S. 140 (1892), and *Remmer v. United States*, 347 U.S. 227, 229 (1954);

(2) by relying on the same statement from a juror's declaration both to raise the presumption of prejudice and to rebut it; and

(3) by requiring Godoy to show a "strong possibility" of prejudice in order to have an evidentiary hearing, contrary to the *Remmer* requirement of a hearing whenever, as here, the presumption attaches but the prejudicial effect of the improper contact is unclear from the record.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The en banc court remanded with instructions that the district court hold a hearing to determine the circumstances of a juror's misconduct, the impact upon the jury, and whether or not it was prejudicial.

---

## COUNSEL

Stephanie Adraktas (argued), Berkeley, California, for Petitioner-Appellant.

James William Bilderback II (argued), Stephanie A. Miyoshi, and Colleen M. Tiedemann, Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Gerald Engler, Chief Assistant Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

---

## OPINION

FISHER, Circuit Judge:

One of the most fundamental rights in our system of criminal justice is the right to trial before an impartial jury. Its common law origin can be traced back to the Middle Ages. It was enshrined in the Sixth Amendment to the Constitution, and it has been embraced by the Supreme Court in numerous cases. The Court reaffirmed just last year that "the guarantee of an impartial jury . . . is vital to the fair administration of justice." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1893 (2016).

Here we address a critical safeguard of an impartial jury, protecting the jury against improper influence from outside parties. Enrique Godoy – after being convicted by a jury of second-degree murder – claimed just such an improper outside influence and moved for a new, untainted trial. Specifically, he alleged that a juror (Juror 10) had communicated about the case while it was ongoing with a "Judge up North." According to an uncontroverted declaration from alternate juror "N.L.," Juror 10 "kept continuous communication" with the "judge friend" "about the case" and passed the judge's responses on to the rest of the jury.

Despite the troubling questions Godoy's allegations raised about the jury's impartiality, the California Court of Appeal upheld the jury's verdict. The court acknowledged that N.L.'s declaration demonstrated juror misconduct and raised a presumption that Godoy was thereby prejudiced. The court concluded, however, that the presumption was rebutted – not because the state made any showing to disprove prejudice, but because N.L.'s declaration itself failed to prove actual prejudice. The California Court of Appeal also affirmed the trial court's refusal to hold a hearing to determine whether prejudice in fact had occurred.

The state appellate court's decision was contrary to the clearly established Supreme Court law that the parties agree governs this case. The Court emphasized long ago that due process does not tolerate "any ground of suspicion that the administration of justice has been interfered with" by external influence. *Mattox v. United States*, 146 U.S. 140, 149 (1892), *called into doubt on other grounds by Warger v. Shauers*, 135 S. Ct. 521, 526–27 (2014). Thus, when faced with allegations of improper contact between a juror and an

outside party, courts apply a settled two-step framework. At step one, the court asks whether the contact was "possibly prejudicial," meaning it had a "tendency" to be "injurious to the defendant." *Id.* at 150. If so, the contact is "deemed presumptively prejudicial" and the court proceeds to step two, where the "burden rests heavily upon the [state] to establish" the contact was, in fact, "harmless." *Remmer v. United States*, 347 U.S. 227, 229 (1954). If the state does not show harmlessness, the court must grant the defendant a new trial. *See Remmer v. United States*, 350 U.S. 377, 382 (1956) (*Remmer II*). When the presumption arises but the prejudicial effect of the contact is unclear from the existing record, the trial court must hold a "hearing" to "determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial." *Remmer*, 347 U.S. at 229–30.

Here, the California Court of Appeal failed to adhere to this framework in three key respects. First, although the state court correctly acknowledged at step one that N.L.'s declaration raised a presumption of prejudice, it never required the state to rebut that presumption at step two. It concluded instead that the presumption was rebutted because Godoy's evidence failed to prove prejudice. But under *Mattox* and *Remmer*, Godoy was not required to prove prejudice at step two; once he triggered the presumption, the burden "rest[ed] heavily upon the [state]" to *disprove* prejudice. *Id.* at 229. Thus, in denying relief because Godoy's evidence did not prove prejudice at step two, the state court acted contrary to *Mattox* and *Remmer*.

Second, setting aside the state court's failure to hold the state to its burden, it was error for the court to rely on the very same statement from N.L.'s declaration both to raise the

presumption of prejudice and to rebut it. This defies not only logic, but also the clearly established definition of a "presumption." It is well settled that a presumption can be rebutted only by other, contrary evidence. It is not enough, as the state court did here, to draw contrary inferences from the same statement that established the presumption in the first place.

Third, the California Court of Appeal denied Godoy a hearing on prejudice under the wrong legal rule. It held he had to show a "strong possibility" of prejudice, but *Remmer* requires a hearing whenever, as here, the presumption attaches but the prejudicial effect of the contact is unclear from the record. *See id.* at 229–30.

Because the state court's decision contravened these bedrock principles, it was "contrary to" clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). Furthermore, because Godoy established the presumption of prejudice, but it is unclear from the existing record whether he, in fact, suffered prejudice, Godoy is entitled to an evidentiary hearing. We therefore reverse the judgment of the district court and remand with instructions to hold a hearing to "determine the circumstances [of Juror 10's misconduct], the impact thereof upon the jur[y], and whether or not it was prejudicial." *Remmer*, 347 U.S. at 230.

I

A

Enrique Godoy was convicted of second-degree murder by a Los Angeles County Superior Court jury. A week before his June 12, 2006 sentencing, he moved for a new trial

alleging that Juror 10 had improperly communicated about the case with a judge friend. Godoy argued that because Juror 10's misconduct "injected . . . improper considerations into the jury's deliberations," "prejudice is presumed, [and] the prosecutor must rebut the presumption or lose the verdict." He argued that "once the court is informed of potential juror misconduct, the court must then conduct hearings to ascertain whether such misconduct has in fact occurred."

To substantiate his allegations, Godoy brought to the June 12 sentencing hearing alternate juror "E.M." The trial judge, apparently believing E.M.'s testimony would impermissibly impeach the jury's verdict, refused to hear live testimony from her, insisting instead that Godoy obtain a sworn declaration. *See Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 861 (2017) (describing the no-impeachment rule). Moreover, because Godoy had not previously informed the state he intended to have E.M. testify, the state sought a continuance to interview her and discover what she had to say.

The trial court put the hearing over to June 29. To facilitate the state's discovery in the interim, the court obtained E.M.'s contact information and informed her that the state would likely contact her for an interview. E.M. gave her cell phone number and address, and she indicated her willingness to speak with the state. We do not know whether the state followed up with E.M., and the state never offered evidence from E.M. regarding Juror 10's communications.

On June 22, Godoy sent the prosecutor a declaration about Juror 10's misconduct, from alternate juror N.L., who wrote that

[d]uring the course of the trial, juror number ten kept continuous communication with a gentleman up north, who she referred to as her "judge friend." Juror number ten explained to us, the jury as a whole, that she had a friend that was a judge up north. From the time of jury selection until the time of verdict, juror number ten would communicate with her "judge friend" about the case via her T-Mobile Blackberry, a two way text paging system. When the jury was not sure what was going on or what procedurally would happen next, juror number ten would communicate with her friend and disclose to the jury what he said.

The state responded to N.L.'s declaration on June 27, two days before the continuation of sentencing. It offered no evidence contrary to the declaration. The state argued instead that the declaration was inadmissible and that it failed to show juror misconduct in the first place because the alleged communications involved procedural issues. As to prejudice, the state simply argued that "the defendant is unable to show any."

On June 29, the court proceedings reconvened. Although no more progress was made toward resolving Godoy's allegations, the trial court denied Godoy's request for another adjournment and then – without explanation – denied his motion for a new trial. Neither Godoy nor the state made any further argument or offered any further evidence at the June 29 hearing. The court then sentenced Godoy to 16 years' to life imprisonment.

## B

Godoy appealed his conviction to the California Court of Appeal, arguing the trial court erred by (1) refusing to presume Juror 10's communications prejudiced the verdict and (2) refusing to hold an evidentiary hearing on the alleged misconduct.[1]

The California Court of Appeal rejected both of these arguments on the merits and affirmed Godoy's conviction. The court agreed with Godoy that "[b]ased on N.L.'s declaration, juror number 10 committed misconduct . . . [,] rais[ing] a rebuttable presumption of prejudice." The court then held, however, that "[t]he presumption of prejudice arising from juror number 10's misconduct was rebutted." The California Court of Appeal cited no evidence other than N.L.'s declaration. Instead, it held N.L.'s declaration itself rebutted the presumption:

> N.L. was an alternate juror with no personal knowledge of what had occurred during jury deliberations. Her declaration indicates that

---

[1] While his direct appeal was pending, Godoy also filed a habeas petition in the California Court of Appeal. The court of appeal denied the petition, saying only that Godoy "fail[ed] to state a prima facie case for relief." The California Supreme Court denied review. In connection with the state habeas petition, Godoy submitted a declaration from E.M. (the juror he had brought to the June 12 hearing). The three-judge panel of this court that first considered Godoy's appeal concluded E.M.'s declaration was not part of the *federal* habeas record, because it was not part of the trial court record the California Court of Appeal considered on direct review. *See Godoy v. Spearman*, 834 F.3d 1078, 1088–89 (9th Cir. 2016). We assume without deciding that this was correct because, even based solely on N.L.'s declaration, Godoy was denied due process.

> the information furnished by juror number 10's "judge friend" related to procedural matters rather than appellant's guilt. Nothing in the declaration suggests that the "judge friend" communicated information prejudicial to appellant. Accordingly, there was no substantial likelihood of juror bias.

The California Court of Appeal also rejected Godoy's argument that he was entitled to an evidentiary hearing on the prejudicial effect of Juror 10's misconduct. It held the trial court properly "refused to conduct an evidentiary hearing on the allegations of juror misconduct" because Godoy had not "come forward with evidence demonstrating a strong possibility that prejudicial misconduct ha[d] occurred." The court affirmed Godoy's conviction, and the California Supreme Court summarily denied review.

Godoy thereafter filed a federal habeas petition raising the same arguments, which the federal district court denied. After a divided three-judge panel of this court affirmed the district court's judgment, a majority of nonrecused active judges voted in favor of rehearing en banc.

II

A

We review de novo a district court's denial of a 28 U.S.C. § 2254 habeas corpus petition. *See Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc). Because Godoy filed his petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA) governs review of his claims. *See Estrella v. Ollison*,

668 F.3d 593, 597 (9th Cir. 2011).  As relevant here, when a state court has adjudicated a claim on the merits, AEDPA permits a federal court to grant habeas relief only if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1).

When reviewing a state court's determination under AEDPA, "we look 'to the last reasoned decision' that finally resolves the claim at issue." *Amado v. Gonzalez*, 758 F.3d 1119, 1130 (9th Cir. 2014) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991)).  Here, that is the California Court of Appeal's decision affirming Godoy's conviction on direct review.

## B

### 1

Even under AEDPA's deferential standard, the California Court of Appeal's decision does not withstand scrutiny.  We begin by outlining the *Mattox* and *Remmer* framework that the parties agree governs Godoy's claim, and which the California Court of Appeal purported to apply.[2]    That framework is straightforward:  When a defendant alleges improper contact between a juror and an outside party, the court asks at step one whether the contact was "possibly prejudicial." *Mattox*, 146 U.S. at 150.  If so, the contact is

---

[2] The presumption of prejudice the California courts apply is derived from *Remmer*.  *See In re Price*, 247 P.3d 929, 938 (Cal. 2011) (citing *Remmer*, 347 U.S. at 229).

"deemed presumptively prejudicial" and the court moves to step two, where the "burden rests heavily upon the [state] to establish" the contact was actually "harmless." *Remmer*, 347 U.S. at 229. If the state does not prove harmlessness, the court sets aside the verdict. When the presumption arises but the prejudicial effect of the contact is unclear, the trial court must hold a "hearing" to "determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial." *Id.* at 229–30.

2

This framework finds its origins in the Supreme Court's 1892 decision in *Mattox v. United States*. After Clyde Mattox was convicted of murdering John Mullen, he filed a new trial motion. In support of his motion, Mattox offered affidavits from two jurors saying that the bailiff had told the jurors that Mullen was "the third fellow [Mattox] ha[d] killed." *Mattox*, 146 U.S. at 142. Mattox also alleged that a newspaper article discussing the trial and Mattox's criminal history "was introduced into the jury room." *Id.* at 143. These contacts, he alleged, violated his right to trial before an impartial jury.

In evaluating Mattox's allegations, the Court began by underscoring the fundamental nature of the right to an impartial jury.

> It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiassed judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated. Hence, the separation of the jury in such a way as to

expose them to tampering, may be reason for a new trial, variously held as absolute; or *prima facie*, and subject to rebuttal by the prosecution; or contingent on proof indicating that a tampering really took place.

*Id.* at 149–50.

To implement this principle, the Court created the foundational rule that applies here: "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Id.* at 150. The Court granted Mattox's motion for a new trial.

Six decades later, in *Remmer*, the Court reaffirmed *Mattox*'s core rule and fleshed out its application. In *Remmer*, the defendant was convicted of federal tax evasion. 347 U.S. at 228. During the trial, FBI agents were sent to investigate a juror who had informed the judge and prosecutor (but not the defense) that he had been told "he could profit by bringing in a verdict favorable to the [defendant]." *Id.* When the defendant learned of the FBI's investigation, he moved for a new trial, alleging the juror's contact with the agents tainted the verdict.

Applying *Mattox*, the Court agreed, holding that

[i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed *presumptively*

> *prejudicial*, if not made in pursuance of
> known rules of the court and the instructions
> and directions of the court made during the
> trial, with full knowledge of the parties. The
> presumption is not conclusive, but *the burden
> rests heavily upon the Government* to
> establish, after notice to and hearing of the
> defendant, that such contact with the juror was
> *harmless* to the defendant.

*Id.* at 229 (emphasis added) (citing *Mattox*, 146 U.S. at 148–50).

Beyond its restatement of the presumption of prejudice, *Remmer* established that once the presumption of prejudice arises, the court must hold a "hearing" – at which the state bears the burden – to "determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial." *Id.* at 230; *see id.* at 229.

The Court explained that a hearing was required because the FBI's investigation raised a possibility of prejudice, but the existing record did not show whether or not prejudice had occurred:

> We do not know from this record, nor does
> the petitioner know, what actually transpired,
> or whether the incidents that may have
> occurred were harmful or harmless. The
> sending of an F.B.I. agent in the midst of a
> trial to investigate a juror as to his conduct is
> bound to impress the juror and is very apt to
> do so unduly. A juror must feel free to
> exercise his functions without the F.B.I. or

> anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

*Id.* at 229–30. The Court made its reasoning even more plain when the case returned to it after remand, explaining that "[i]t was the *paucity of information* relating to the entire situation *coupled with the presumption* which attaches to the kind of facts alleged by petitioner which, in our view, made manifest the need for a full hearing." *Remmer II*, 350 U.S. at 379–80 (emphasis added). Because the government never rebutted the presumption of prejudice, the Court granted the defendant a new trial. *See id.* at 381–82.

Taken together, *Mattox* and *Remmer* clearly establish the framework that applies to Godoy's allegations.[3] Under this

---

[3] Some courts have viewed *Smith v. Phillips*, 455 U.S. 209, 215 (1982), as limiting *Mattox* and *Remmer*. *See, e.g.*, *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984). We have previously questioned, in dictum, whether *Smith* limited the scope of *Remmer*, even as we held that *Remmer* remains good law as applied to jury tampering. *United States v. Dutkel*, 192 F.3d 893, 895–96 & n.1 (9th Cir. 1999). *Smith* did not, however, purport to abrogate these earlier decisions in any respect, and no Supreme Court authority has suggested that it did. Consistent with the Court's treatment of the issue, our own case law continues to follow *Mattox* and *Remmer*, *see, e.g.*, *Tarango v. McDaniel*, 837 F.3d 936, 947–49 (9th Cir. 2016), *cert. denied sub nom. Filson v.*

framework, the California Court of Appeal's decision contravened *Mattox* and *Remmer* in three respects.

C

1

The California Court of Appeal's first two errors boil down to the same central problem:  The court applied the presumption of prejudice in name alone.  It did so first by failing to place any burden on the state to rebut the presumption of prejudice and second by relying on the exact same statement from N.L.'s declaration both to establish the presumption and to rebut it.

Turning first to the burden issue, the state court properly acknowledged that, based on N.L.'s declaration, Godoy established a presumption of prejudice.  Under *Mattox* and *Remmer*, that was the only burden Godoy needed to carry; once he triggered the presumption, the burden shifted to the state to prove the contact was "harmless."  *Remmer*, 347 U.S. at 229 (citing *Mattox*, 146 U.S. at 148–50).  The California Court of Appeal, though, never held the state to this burden. Indeed, it did not require the state to make *any* showing at step two.    Rather than requiring the state to prove harmlessness – something the state never attempted to do – the state court held that "[t]he presumption of prejudice

---

*Tarango*, 2017 WL 635904 (U.S. Apr. 24, 2017); *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 695–97 (9th Cir. 2004); *United States v. Littlefield*, 752 F.2d 1429, 1431 (9th Cir. 1985), as does California's case law, *see, e.g.*, *Price*, 247 P.3d at 938.  We reaffirm now that *Smith* left *Mattox* and *Remmer* intact.  We also note that the California Court of Appeal in this very case treated the *Mattox* and *Remmer* framework as the governing law, and the state does not argue otherwise on appeal.

arising from juror number 10's misconduct was rebutted" because "[n]othing *in [N.L.'s] declaration* suggests that the 'judge friend' communicated information prejudicial to appellant. Accordingly, there was no substantial likelihood of juror bias." (emphasis added). But saying the presumption was rebutted because *Godoy's* evidence failed to prove actual prejudice is the equivalent of placing the entire burden of proof on Godoy. Under *Mattox* and *Remmer*, that was clearly wrong.

2

The California Court of Appeal's reliance on N.L.'s declaration to rebut the presumption also led to a second error under *Remmer*. Once the state court decided that a statement in N.L.'s declaration triggered the presumption of prejudice, it could not rely on the exact same statement to conclude the presumption was rebutted – effectively negating the presumption. Here is the entirety of what N.L. said about Juror 10's misconduct:

> During the course of the trial, juror number ten kept continuous communication with a gentleman up north, who she referred to as her "judge friend." Juror number ten explained to us, the jury as a whole, that she had a friend that was a judge up north. From the time of jury selection until the time of verdict, juror number ten would communicate with her "judge friend" about the case via her T-Mobile Blackberry, a two way text paging system. When the jury was not sure what was going on or what procedurally would happen next, juror number ten would communicate

with her friend and disclose to the jury what
he said.

This statement cannot be read to both raise and rebut the presumption of prejudice. Although this is true as a matter of common sense, it is also clear from *Remmer* itself. The Court applied a *presumption* of prejudice, and a "presumption" can be rebutted only by contrary evidence. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) ("[I]f [one party] is silent in the face of the presumption, the court must enter judgment for [the other party] because no issue of fact remains in the case."); *Lincoln v. French*, 105 U.S. 614, 617 (1881) ("Like other presumptions, it was sufficient to control the decision of the court if no rebutting testimony was produced."); *Presumption*, *Black's Law Dictionary* (10th ed. 2014) ("calling for a certain result . . . unless the adversely affected party overcomes it *with other evidence*" (emphasis added)); *Rebuttable Presumption*, *Black's Law Dictionary* (10th ed. 2014) ("[a]n inference" that "may be overcome *by the introduction of contrary evidence*" (emphasis added)); 9 J. Wigmore, *Evidence in Trials at Common Law* § 2491 (3d ed. 1940) (the "effect of a presumption . . . is . . . to invoke a rule of law compelling the jury to reach the conclusion *in the absence of evidence to the contrary* from the opponent"); 2 K. Broun, *McCormick on Evidence* § 343 (7th ed. 2016) ("A presumption shifts the burden of producing evidence, and may assign the burden of persuasion as well."). In every context of which we are aware, a presumption can be rebutted only by contrary evidence.

There is no reason to think the presumption recognized in *Remmer* deviates from this well-settled definition. Here, that means the state needed to produce some evidence contrary to N.L.'s declaration, not simply draw contrary inferences from

the same statement that established the presumption. The state neither offered contrary evidence nor pointed to contrary evidence elsewhere in the record. The single statement from N.L.'s declaration was the only evidence either party offered. Thus, once the California Court of Appeal concluded this statement triggered the presumption, the absence of any additional evidence shedding light on prejudice means the presumption should have carried the day. Because the state court concluded otherwise, it acted contrary to *Remmer*.[4]

Furthermore, even if it were permissible to view a single statement as both raising and rebutting a presumption of prejudice, that would not be possible here, because nothing in N.L.'s statement demonstrates that the improper communications were harmless. The state court focused on N.L.'s use of the word "procedurally," theorizing that communications between a judge and a jury concerning procedural matters could not influence the jury's verdict. But the state court knew nothing about what "procedural" matters were discussed. It also had no idea what N.L. meant by the word "procedurally." The state court ignored that communications about procedural matters could well have

---

[4] We recognize that in theory the same declaration could both raise and rebut a presumption where the court looks only to one part of the declaration to conclude the presumption exists but consults the declaration as a whole to conclude the contact was actually harmless. But nothing in the case law suggests this is how the *Mattox* and *Remmer* framework works, and there is certainly no indication the state court engaged in this sort of parsing, blinding itself at step one to anything suggesting Juror 10's communications were innocent. We assume the state court did what it was supposed to do at step one – look at the entirety of N.L.'s statement, in its full context, to determine whether a possibility of prejudice existed at all.

influenced the jury.[5]   In sum, no reasonable jurist could conclude, based only on N.L.'s declaration, that the communications between the jury and Juror 10's judge friend were harmless.

3

Finally, the California Court of Appeal's decision was also contrary to *Remmer* because it denied Godoy an evidentiary hearing under the wrong legal rule.  The court of appeal concluded the presumption attached but nonetheless held that the trial court properly "refused to conduct an evidentiary hearing on the allegations of juror misconduct" because Godoy had not "come forward with evidence demonstrating a *strong possibility* that prejudicial misconduct ha[d] occurred."  (emphasis added).  *Remmer*, however, clearly requires a hearing where, as here, the presumption of prejudice attaches yet the prejudicial effect of the communications is unclear from the existing record.  There is no additional requirement that the defendant establish a "strong possibility" of prejudice.  *See Remmer*, 347 U.S. at 229–30; *Remmer II*, 350 U.S. at 379–80.  Thus, the court of appeal's decision that the trial court properly "refused to conduct an evidentiary hearing" was contrary to *Remmer*.

---

[5] The description by N.L. indicates that the discussions with the judge were not limited to procedural matters.  N.L. said Juror 10 contacted her judge friend when "the jury was not sure what was going on *or* what procedurally would happen next."  (emphasis added).  The phrase "was not sure what was going on" could refer to substantive legal or factual questions as easily as procedural questions, and the use of "or" suggests some of the inquiries went beyond "what procedurally would happen next."

### III

Because the California Court of Appeal's decision was contrary to *Mattox* and *Remmer*, AEDPA is no bar to habeas relief, and we evaluate Godoy's claim "without [the] deference to the state court's decision" that "AEDPA normally requires." *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007). That is, "we review de novo . . . , applying the correct legal standard to determine whether the applicant is entitled to relief." *Castellanos v. Small*, 766 F.3d 1137, 1146 (9th Cir. 2014).

### A

Because we now must review Godoy's claim de novo – rather than through the lens of AEDPA – we reiterate the governing two-step process.

### 1

At step one, the court determines whether the alleged external contact was "possibly prejudicial." *Mattox*, 146 U.S. at 150. To meet this "low threshold," the defendant must present "evidence of an external contact that has a 'tendency' to be 'injurious to the defendant.'" *Tarango v. McDaniel*, 837 F.3d 936, 947, 949 (9th Cir. 2016) (quoting *Mattox*, 146 U.S. at 150), *cert. denied sub nom. Filson v. Tarango*, 2017 WL 635904 (U.S. Apr. 24, 2017). The contact must "raise a credible risk of influencing the verdict" before it triggers the presumption of prejudice. *Id.* at 947; *accord Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 697 (9th Cir. 2004).

We recognize the practical impossibility of shielding jurors from all contact with the outside world, and also that not all such contacts risk influencing the verdict. *See Tarango*, 837 F.3d at 947 (citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). Thus, the defendant's burden at step one cannot be met by "[t]hreadbare or speculative allegations" of misconduct. *Id*. Nor do "allegations involving prosaic kinds of jury misconduct," *id*. (internal quotation marks omitted), such as "chance contacts between witnesses and jury members – while passing in the hall or crowded together in an elevator," *id.* at 951, trigger the presumption. The defendant must present evidence of a contact sufficiently improper as to raise a credible risk of affecting the outcome of the case.

Among the considerations relevant to this determination are the identity of the outside party and the nature of the contact. We have held, for example, that "undue contact" between jurors and certain government officers – like bailiffs or law enforcement agents – will "almost categorically" trigger the presumption. *Id.* at 947. This may be especially true when the officer is "deeply entangled in [the] case." *Id.* at 949 (applying the presumption where police officers who were victims, investigators and witnesses in the case tailed a holdout juror on his drive to the courthouse); *see also Parker v. Gladden*, 385 U.S. 363, 365 (1966) (per curiam) ("[T]he official character of the bailiff – as an officer of the court as well as the State – beyond question carries great weight with a [sequestered] jury which he had been shepherding for eight days and nights."); *Remmer*, 347 U.S. at 229 ("The sending of an F.B.I. agent in the midst of a trial to investigate a juror . . . is bound to impress the juror and is very apt to do so unduly. A juror must feel free to exercise his functions without the F.B.I. . . . looking over his shoulder."); *Mattox*,

146 U.S. at 151 ("Nor can it be legitimately contended that the misconduct of the bailiff could have been otherwise than prejudicial. Information that this was the third person Clyde Mattox had killed, coming from the officer in charge, precludes any other conclusion."). Similarly – regardless of the outside party's identity – communications "about the matter pending before the jury," "if not made in pursuance of [the] rules . . . and the instructions . . . of the court," greatly increase the risk of prejudice. *Remmer*, 347 U.S. at 229; *see also Caliendo*, 365 F.3d at 697–98 ("Other factors may include the length . . . of the contact, . . . evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction.").

We bear in mind that even such highly troubling contacts do not *necessarily* raise a presumption of prejudice. At step one, the court considers the full context of the contact to determine whether a credible risk of prejudice exists. Contact with a government officer, for example, will trigger the presumption only if the defendant shows the contact was somehow improper. Similarly, even contact about the case may be insufficient to trigger the presumption if the surrounding circumstances show the contact was innocuous.

Importantly, however, the defendant's burden at step one to show a possibility of prejudice is not onerous. The defendant need only demonstrate a *credible* risk, and the presumption may arise even when "[w]e do not know from th[e] record . . . what actually transpired, or whether the

incidents that may have occurred were harmful or harmless."
*Remmer*, 347 U.S. at 229.**[6]**


2


Once a defendant shows a possibly prejudicial contact,
the presumption of prejudice attaches, and the burden shifts

---

**[6]** Some of our cases have suggested the presumption attaches under
only more limited circumstances. For example, in *United States v. Dutkel*,
192 F.3d 893, 895–96 & n.1 (9th Cir. 1999), we said in dictum that the
presumption of prejudice arises only in the context of jury tampering (i.e.,
threats or bribes intended to influence the jury's decision). Although
tampering is among the types of contacts that may raise a presumption,
nothing in *Mattox* or *Remmer* suggests this is the *only* circumstance where
the presumption arises. *See Remmer*, 347 U.S. at 229 ("private
communication, contact, *or* tampering" may trigger the presumption
(emphasis added)); *Mattox*, 146 U.S. at 150 ("Private communications,
possibly prejudicial . . . invalidate the verdict . . . unless their harmlessness
is made to appear."). We have also suggested that the presumption applies
only to the introduction of extraneous information – not to ex parte
contacts that do not impart information "pertain[ing] to any fact in
controversy or any law applicable to the case." *United States v.
Rosenthal*, 454 F.3d 943, 949 (9th Cir. 2006) (internal quotation marks
omitted) (summarizing cases). Although, as noted, it is certainly relevant
whether the contact was "about the matter pending before the jury,"
*Remmer*, 347 U.S. at 229, neither *Remmer* nor *Mattox* suggests that the
outside party must actually "submi[t] . . . extraneous information (e.g., a
file or dictionary) to the jury" before the presumption arises, *Rosenthal*,
454 F.3d at 949 (internal quotation marks omitted). In *Tarango*, for
example, the police officers who tailed the holdout juror on his drive into
the courthouse imparted no specific information about any fact or point of
law in the case. 837 F.3d at 942–43. This contact was nonetheless
"possibly prejudicial" within the meaning of *Mattox* and *Remmer*. *See id.*
at 949–50. Accordingly, we reiterate that any outside contact raising a
credible risk of influencing the verdict triggers the presumption of
prejudice. To the extent cases such as *Dutkel* and *Rosenthal* suggested
otherwise, they are **disapproved**.

to the state to prove the contact was harmless. *See id*. Harmlessness in this context means "that there is no reasonable possibility that the communication . . . influence[d] the verdict." *Caliendo*, 365 F.3d at 697.

As previously discussed, the state must rebut the presumption by pointing to some evidence contrary to the evidence that established it. Drawing contrary inferences from the same evidence is not enough. That approach would be contrary to the meaning and effect of a legal presumption.

Given the fact-based nature of this inquiry, we express no opinion on what that contrary evidence must be in any given case, or where the prosecution must obtain it. Most obviously, though, the prosecution could seek evidence from the jurors themselves – as the state had the opportunity to do here – or from the outside party who had contact with the jury. *See United States v. Remmer*, 122 F. Supp. 673, 673–74 (D. Nev. 1954) (at the hearing on remand from the Supreme Court, the court heard the testimony of 27 witnesses, including 12 members of the jury, two alternate jurors, the person who communicated with the juror and the FBI agent who conducted the investigation); *see also Smith*, 455 U.S. at 213, 217 & n.7 (approving in a related context the trial court's reliance on the allegedly biased juror's testimony explaining the harmlessness of his conduct); *Remmer II*, 350 U.S. at 380–81 (relying on the evidence adduced at the remand hearing from the third parties who had contact with the jury to conclude the state had not shown harmlessness); *Tarango*, 837 F.3d at 951–52 (holding that on remand, the trial court should consider juror testimony about the allegedly prejudicial contact); *United States v. Rutherford*, 371 F.3d 634, 638, 643–45 (9th Cir. 2004) (considering juror affidavits about alleged jury intimidation by government agents).

Alternatively, the prosecution might find contrary evidence elsewhere in the existing record that sheds new light on the potentially prejudicial communication. Or the prosecution could seek further evidence about the content of the communications themselves, to show, for example, that rather than texting about the case, the juror was simply asking a friend out to dinner. These examples are not exhaustive, only illustrative. In short, regardless of its source of rebuttal evidence, the prosecution must point to some contrary evidence in attempting to rebut the presumption of prejudice.

In addition, once the presumption attaches, the trial court must hold a hearing on prejudice if there is any remaining uncertainty about "what actually transpired, or whether the incidents that may have occurred were harmful or harmless." *Remmer*, 347 U.S. at 229; *see Remmer II*, 350 U.S. at 379–80. The form of this hearing may vary, depending on what is necessary to "determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial," *Remmer*, 347 U.S. at 230, but due process always "requires . . . that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality," *Dyer v. Calderon*, 151 F.3d 970, 974–75 (9th Cir. 1998) (en banc). In many, if not most, cases, that will mean the "full hearing" that *Remmer* deemed "manifest[ly]" necessary. *Remmer II*, 350 U.S. at 380; s*ee Remmer*, 122 F. Supp. at 673–74 (at the hearing on remand from the Supreme Court, the court heard the testimony of 27 witnesses); *see also Smith*, 455 U.S. at 213, 217 (approving in a related context the full evidentiary hearing conducted by the trial court). In some cases, however, something like a more "informal in camera hearing may be adequate" to address the defendant's allegations. *Dyer*, 151 F.3d at 974. If the state

fails to demonstrate the contact was harmless, the defendant's conviction is unconstitutional.

B

1

Applying the requisite framework here, Godoy offered evidence of possibly prejudicial communications that triggered the presumption of prejudice, as the California Court of Appeal found. Godoy submitted undisputed evidence – N.L.'s declaration – that Juror 10 "kept continuous communication" with her "judge friend" "about the case" "[d]uring the course of the trial" and "disclose[d] to the jury what he said." Although the judge friend was not a state officer "entangled in this case," *Tarango*, 837 F.3d at 949, his status as a judge is nonetheless relevant to the step one inquiry. The weight a judge's comments would carry with the jury greatly increases the risk that his advice about the case swayed its decision. As noted, that some of the communications perhaps concerned procedural matters does not mitigate this risk. *See supra* note 5 and accompanying text. Procedural guidance on questions such as why certain evidence was excluded, or how the jury was to determine guilt, could certainly influence the jury's decision. *See Rosenthal*, 454 F.3d at 950.[7] These facts, taken together, indisputably show an external contact raising a credible risk of influencing the verdict.

---

[7] That N.L. was an alternate juror does not detract from the possible prejudice conclusion. N.L.'s statement concerned communications throughout the trial – not just during deliberations – communicated to all the jurors, including the alternates. It is also plausible N.L. heard from other jurors that the communications continued during deliberations.

2

Having concluded Godoy triggered the presumption of prejudice, the next question is whether the state rebutted the presumption by showing Juror 10's communications were, in fact, harmless. On the existing record, the state has not made that showing. We simply "do not know from this record . . . what actually transpired, or whether the incidents that may have occurred were harmful or harmless." *Remmer*, 347 U.S. at 229. Because the existing record is unclear as to prejudice, and no evidentiary hearing on prejudice has yet been held, we remand to the district court to conduct such a hearing. *See id.* at 230; *Tarango*, 837 F.3d at 952.**[8]** On remand, the district court should "determine the circumstances [of Juror 10's misconduct], the impact thereof upon the jur[y], and whether or not it was prejudicial." *Remmer*, 347 U.S. at 230.

If the state does not present contrary evidence that rebuts the presumption of prejudice by showing "there is no reasonable possibility that [Juror 10's] communication[s] . . . influence[d] the verdict," *Caliendo*, 365 F.3d at 697, the district court should grant Godoy's petition for a writ of habeas corpus. To be clear, to make the necessary showing, the state must present evidence beyond N.L.'s declaration. It cannot rely simply on N.L.'s status as an alternate juror or on the fact that some of the communications may have involved procedural matters. For example, the most relevant evidence would be the actual content of the text messages or testimony

---

**[8]** Because we evaluate Godoy's claim de novo, the Supreme Court's decision in *Cullen v. Pinholster*, 563 U.S. 170 (2011), does not preclude remand for an evidentiary hearing in the district court. *See Crittenden v. Chappell*, 804 F.3d 998, 1010 (9th Cir. 2015); *Johnson v. Finn*, 665 F.3d 1063, 1069 n.1 (9th Cir. 2011).

from a juror showing what actually transpired between Juror 10 and her judge friend, sufficient to find there is "no reasonable possibility" Godoy was prejudiced. *Id.* Under the circumstances of this case, given the time that has elapsed, it may be difficult for the state to meet its heavy burden on remand, but we nevertheless afford it the opportunity to do so.

## IV

We reverse the judgment of the district court and remand with instructions to hold an evidentiary hearing to determine the factual basis of Juror 10's misconduct and its prejudicial effect, if any, on Godoy's verdict.

**REVERSED and REMANDED.**